No. 7236.

LAKE SHORE AND MICHIGAN SOUTHERN RAILWAY COMPANY *v.* BENNETT.

COMMON CARRIER.—*Delay in Transportation.*—*Special Contract.*—*Evidence.*— *Variance.*—Where an action is brought against a common carrier to recover damages for an alleged delay in the transportation and delivery of live-stock, and the complaint counts upon a breach of the common law duty of such carrier, if the evidence show a special contract, which was not declared upon for the transportation of such stock, the variance is fatal and the plaintiff can not recover.

SAME.—*Delay Caused by Mob.*—*Insurrection and Riot.*—In such case, where the delay in transportation of stock is caused, not by the negligence or wrongful act of the carrier or its employees, but solely by the violence and riotous conduct of a lawless mob, which the carrier and the civil authorities of the State are alike unable to resist or control, the defendant is not liable for the damages resulting from such delay.

From the Noble Circuit Court.

*J. B. Niles, J. I. Best* and *O. G. Getzendanner,* for appellant.

*A. A. Chapin,* for appellee.

HOWK, J.—In this action the appellee sued the appellant, in a complaint of two paragraphs. In the first paragraph the appellee sought to recover damages of the appellant for an alleged breach of its common-law duty, as a common carrier

for hire, in the transportation of freight. It is very clear, however, that the special findings and judgment below in this case were not founded upon the first paragraph of the complaint, and, therefore, it need not be further noticed.

In the second paragraph of his complaint the appellee alleged, in substance, that the appellant, before and at the time of committing the grievances thereinafter mentioned, was a common carrier of cattle and other live-stock, for a certain price or reward paid to the appellant, and that, on July 21st, 1877, at Kendallville station, in Noble county, Indiana, he delivered to appellant, and the appellant then and there received from him, one car-load of cattle, to wit, 16 head of cattle, of the value of $1,600, to be carried and conveyed upon appellant's railroad in a car, from said Kendallville station to East Buffalo station, on said road, in the State of New York, without default, negligence or unreasonable delay on the appellant's part, and to be delivered at East Buffalo station without any unreasonable delay by appellant to appellee; that the distance from Kendallville station to East Buffalo station was 388 miles; that, by reason of the great distance and the nature of said property, it was necessary that a person should accompany said cattle, for the purpose of caring for and attending to them during their transit; that, for the purpose of so caring for and attending to said cattle, it was agreed by and between appellee and appellant that the appellee, without extra charge, should be carried by appellant without delay, in the train of cars in which said cattle were to be transported from Kendallville to East Buffalo, and that appellee should care for and attend to said cattle while being so transported; and to that end and purpose the appellant executed, as did also the appellee, a written contract, a copy of which was therewith filed, whereby the appellant agreed that the appellee should have the care and control of said cattle while on the appellant's grounds or in transit, and should direct and control the handling and loading and unloading of said cattle.

And the appellee averred that, in pursuance of said agree-

ment, he entered upon said train of cars for the purpose of caring for and attending to said cattle, and was ready and willing so to do; but the appellant, not regarding its duty in that behalf, so negligently and improperly conducted itself in and about the carriage and conveyance of the appellee and his said cattle, that he and his cattle did not arrive, without unreasonable delay, at East Buffalo station; that appellant, in violation of its said agreement, while said cattle were in transit and before they had arrived at the place of delivery, at a station called Collingwood, in the State of Ohio, without any fault of the appellee and without his consent, refused to permit him to have further care and control of said cattle, and, by its agents, servants and employees, then and there assumed the sole and exclusive care and control of said cattle, for the space of eleven days, and then and there by its agents, servants and employees, carelessly, negligently and recklessly, without sufficient and safe reasons for so doing, unloaded said cattle from the cars in which they were being carried, and, by reason thereof, said cattle were bruised, lamed, strained and otherwise injured; that the appellant, by its servants and employees, then drove said cattle, with other and strange cattle, on foot a distance of twenty miles over a dusty road, and during intensely hot weather, to another station on said railroad, known as the Painesville station, and there confined appellee's cattle, with 75 head of other and strange cattle, in a cattle-pen which was not large enough to properly contain more than 32 head of cattle, and, still refusing to permit appellee to feed, water, care for and attend to his said cattle, kept them in such overcrowded condition, without any shelter from the heat of the sun and protection from the weather, in said cattle-pen with said other cattle, for the space of eleven days; that while being so driven, and while confined in said pen, said cattle were maimed, bruised and wounded by the other strange cattle and by each other, and were heated and worried, by reason of all which and by said delay the said cattle, through the neglect and carelessness of appellant's agents, servants and employees,

became sick, sore, unsalable and greatly depreciated in condition, weight and value; and by reason thereof, and by a fall of three cents per pound in the price of cattle at said place of delivery, between the day when, by due diligence, said cattle ought to have been delivered, and the day of their actual delivery, the said cattle were worth $490 less than they would have been, if they had been properly handled, cared for and attended to, and been delivered at East Buffalo station without unreasonable delay.

And the appellee further said that, during the time his cattle were so delayed, at appellant's request, he remained at Painesville until the appellant again loaded the cattle upon the cars, and commenced again to carry them to East Buffalo station, to wit, for eleven days; that, during that time, he expended the sum of $25 for his board and lodging, and his time was reasonably worth the sum of $25; that he also paid for feed and other expenses of his cattle the sum of $75; and that he had been damaged, in the premises, in the sum of $490. Wherefore, etc.

The cause was put at issue and tried by the court; and, at the appellant's request, the court made a special finding of the facts and of its conclusions of law thereon. The appellant excepted to the court's conclusions of law, upon the facts specially found, and filed its bill of exceptions. Its motion for a new trial having been overruled, and its exception saved to this ruling, the court rendered judgment for the appellee for his damages assessed, and costs.

In this court the appellant has assigned the following errors:

1. The circuit court erred in each of its conclusions of law upon the facts specially found;

2. The court erred in overruling appellant's demurrer to the second reply to its answer; and,

3. The court erred in overruling appellant's motion for a new trial.

The court's special finding of facts is very long; but it is

necessary, we think, to the proper presentation of the questions to be decided, that we should give a summary, at least, of the facts specially found, and this we will do accordingly, as follows:

1. The court found that on and before July 21st, 1877, the appellant owned and operated a railroad, known as the Lake Shore and Michigan Southern Railway, extending from the city of Chicago, Illinois, to East Buffalo, New York, and passing through Kendallville, Indiana, and Collingwood, a station six miles east of the city of Cleveland, Ohio; that on and before the day named, appellant had been engaged in transporting, on its railroad, cattle and other live-stock for reward, and possessed all proper facilities for and solicited such employment.

2. On July 21st, 1877, appellee delivered to appellant, at Kendallville, sixteen steers of the value of $1,200, to be transported from that place over said railroad to East Buffalo; which steers were delivered to and received by the appellant, under a special contract, executed by the parties at the time, of which the following is a copy:

"Lake Shore and Michigan Southern Railway Company. Stock Contract.

"KENDALLVILLE STATION, July 21st, 1877.

"Memorandum of agreement made and concluded this day above named, by and between the Lake Shore and Michigan Southern Railway Company, of the first part, by their station agent at the above named station, and A. B. Bennett, of Kendallville, of the second part, witnesseth: That, whereas said railway company does not and will not assume or consent, as a common carrier, to transport live-stock, nor will it carry the same, except on the condition that the owner of the property will take care of the same while in transit, and will give careful attention to its handling: Now, therefore, in consideration that said railway company will transport, for the said party of the second part, one car load of live-stock at the special rate of forty-eight dollars per car load, the said

party of the second part does hereby agree to take care of
and look after said stock while in the cars or on the grounds
of the company, or in transit, and hereby does assume all
and every risk of injury which the animals or either of them
may receive in consequence of any of them being wild,
vicious, unruly, weak, escaping, maiming or killing themselves
or each other, or from delays, or in consequence of heat, suf-
focation, or the ill effects of being crowded upon the cars of
said railway company, or on account of being injured by the
burning of hay, straw or any other materials used by the owner
for feeding the stock or otherwise, and for any damage occa-
sioned thereby; and also all risks of any loss or damage
which may be sustained by reason of any delay, or from any
other cause or thing in or incident to, or from or in, the
loading or unloading said stock. It being understood that,
previous to loading, the owners agree to examine for themselves
the cars, and in order to guard against accidents that may
happen in consequence of insecurity (if any there be) in the
floor, frame or doors of the cars, the owners of the stock un-
dertake to point out to the agent of the company any per-
ceptible defect in such cars, to be repaired.

"And it is further agreed, that the said party of the second
part is to load and unload said stock at his own risk, the said
railway company furnishing the necessary laborers to assist,
under the direction and control of said party of the second
part, who will examine for himself all the means used in the
loading and unloading, to see that they are of sufficient
strength, of the right kind, and in good repair and order.
And it is further agreed between the parties hereto, that
each and every of the persons, riding free to take care and
charge of said stock, do so at their own risk of personal in-
jury from whatever cause; and that said party of the second
part, for the consideration aforesaid, hereby release and agree
to hold harmless, and keep indemnified, the said party of the
first part of and from all damages, actions, claims and suits
on account of any and every the injuries, loss and damages

hereinbefore referred to, if any such occur or happen. This company will not be responsible for any loss or damage to the property after the same shall have been delivered to any connecting railroad, or other carrier, on the route to the point to which it is consigned; and all liability for any cause shall cease when said property shall be so delivered to a connecting line. And it is expressly agreed, that the railway company shall not, under any circumstances, nor from any cause, be held liable beyond the sum of $200 for injury to or loss of any single animal carried pursuant to this agreement, although its actual value may exceed that amount, unless its valuation and special accommodations for it, at a distinct rate, shall be stipulated in this agreement. And this agreement further witnesseth, that the said party of the second part has this day delivered to said company one car load of cattle to be transported to East Buffalo, on the conditions, stipulations, and the understandings above expressed."

This contract was executed by the appellant's station agent at Kendallville, and by said A. B. Bennett, and was dated July 21st, 1877.

3. The usual running time in the transportation of cattle by appellant from Kendallville to East Buffalo was thirty-three hours. On the evening of July 21st, 1877, the appellee's cattle, accompanied by him for the purpose of caring for them, were started in appellant's train of cars for East Buffalo station, and were carried with reasonable diligence and care until they arrived, about two o'clock p. m., of July, 22d, 1877, at Collingwood station, about six miles east of Cleveland, Ohio, on the Erie division of said railroad. The train of cars upon which appellee's cattle were being carried stopped as usual at Collingwood for the purpose of changing engines and train hands; but the train did not leave there, as it ordinarily did, and proceed on its way to East Buffalo. The train remained on the track where it stopped, at Collingwood, until four o'clock p. m. of the next day, and appellee's cattle were without food and water. In the mean time there ar-

rived at Collingwood many trains of cars, loaded with cattle, sheep and hogs, of which 160 cars were loaded with cattle, all going eastward on appellant's railroad. For reasons hereinafter stated, on the evening of July 23d, 1877, the appellee's cattle and all the other cattle, sheep and hogs, then on appellant's cars at Collingwood, were unloaded by appellant from the cars, as they stood on the track of its road, by jumping the cattle out of the cars to the ground, a distance of about four feet, thereby injuring them. After appellee's cattle and the other cattle were so unloaded, they were driven to Painesville, a station about twenty miles east of Collingwood on appellant's railroad, where there were cattle-yards in which they could be herded, watered and fed, there being no cattle-yards at Collingwood. The cattle had been without water for about thirty hours, and were very thirsty, and in passing streams of water between Collingwood and Painesville they drank to excess and were thereby injured. On July 24th, 1877, the cattle arrived at Painesville, and were placed by appellant in the cattle-yards and fed and watered. Appellee's cattle were placed with 75 head of strange cattle in a cattle-yard much too small for so many cattle, and appellant placed locks on the gates and fastened the cattle in, and they were there confined for eleven days, without shelter and exposed to the heat of the sun. Appellee's cattle were of the Durham breed, and very docile and tame, and, by reason of the crowded condition of the yard, they were hooked, gored and jaded by the other cattle, and were greatly depreciated in weight and value. In about eleven days after their arrival at Collingwood, appellee's cattle were again placed on appellant's cars at Painesville and transported to East Buffalo, the place of their original destination.

4. When appellee's cattle arrived at Collingwood, on July 22d, 1877, appellant was willing to carry the cattle in said car eastward to East Buffalo, and had the proper cars and engines to perform its contract, but it was prevented from proceeding and completing, in the usual time, the carriage of the cattle

to their place of destination. A few weeks prior to the arrival of said cattle at Collingwood, appellant had made an order reducing the wages of its employees on its trains, at its stations and shops, ten per cent.; and nearly all the brakemen and firemen in its employ refused to perform their work, or to permit others to perform their work on appellant's trains, or to move its trains as it wished to do. Nearly all the appellant's firemen and brakemen, who had not been discharged by appellant, with other lawless persons, took forcible possession of all the engines and their fixtures, and the round-house, and placed the engines therein and barricaded the same, detached all the hose of the engines, uncoupled the cars and hid the coupling-pins, and, with great force, took full and complete possession of all of the appellant's property at Collingwood station. The persons, who took such forcible possession of appellant's property, boldly and defiantly refused to obey all orders of appellant's officers, and refused to permit any of its trains to be moved by any persons whatever, and openly threatened the lives of any persons who should attempt to move said trains, or obey the appellant's officers in relation to the movement of its trains or cars, unless the wages of the employees should be restored as they were before their reduction. Appellant's officers made several attempts to move its trains from Collingwood, and placed thereon employees who were faithful to appellant; but they were prevented by personal violence from moving said trains, and, to save their lives, they were compelled to desist from all efforts to move the appellant's trains. The resistance to the commands of appellant's officers, in the movement of its trains, was composed of a lawless assembly of persons and assumed the character of a mob, of a very alarming appearance and dangerous for appellant to oppose, and could not be opposed and overcome without strong military power. The threatened violence was so great that appellant was powerless to resist or overcome it, and the authorities of the State of Ohio failed and,

for a considerable time, were unable to suppress it. The forcible resistance to the movement of appellant's trains commenced, and the lawless assemblage of persons met, at almost the time of arrival of the train with appellee's cattle at Collingwood, on July 22d, 1877, and continued for eleven days, and until said cattle were re-shipped at Painesville, as before stated. During all the time, from the day the cattle arrived at Collingwood until they were reshipped at Painesville, the appellant's officers exerted themselves to move said trains, and did all that could be done to induce the persons, who had been in appellant's employ, to desist from their unlawful and riotous conduct, and permit appellant to use and control its own property; but they refused so to do, except on condition that the order for the reduction of their wages should be annulled and their wages restored to the former rate. If appellant had rescinded its order reducing wages ten per cent., and restored the wages as they were before the reduction, the court found that its employees would have resumed their work and have ceased all force and violence to its officers and faithful servants, and have restored to appellant the possession and control of its property and railroad; but it refused so to do, and the resistance continued during all said time. On account of such forcible resistance and the unlawful seizure of its engines and property, appellant was prevented from moving its trains and proceeding with appellee's cattle.

5. Appellant had a round-house at Collingwood, where it kept many locomotives and usually changed the engines used in moving its freight trains; but it did not unload, feed or water cattle there, and had no facilities for so doing.

6. Strikes and riots were occurring, about the same time, on other railroads in the United States, and had resulted, at some places, in the destruction of much railroad and other property; and the general belief was that all the persons who took forcible possession of railroad property in defiance of lawful authority were acting under and controlled by the

orders of a secret body, enforced by violence and regardless of the laws of the land.

7. Appellant's officers, during said time, had cause to fear and did fear a great destruction of property by the persons who had so forcibly and unlawfully taken possession of appellant's railroad and other property; and they acted cautiously and prudently with the rioters, so as not to provoke the destruction of property.

8. Appellant's officers were unable to move their trains eastward and carry appellee's cattle to East Buffalo, or to any other place where they could be cared for, fed and watered, on account of such violence, although they had a sufficient number of employees who were ready and willing to move the train, with appellee's cattle, to East Buffalo, but were prevented on account of such violence from so doing. The appellant's officers took exclusive control of the cattle in unloading them, and kept such control until they were reloaded on the cars at Painesville. The best that could be done to preserve the cattle was to drive them to Painesville, where they could be fed and watered; and, on account of the large number of cattle so stopped and delayed at Collingwood, it was impracticable for the several owners thereof to unload and drive them separately to Painesville. Considering the great number of cattle on the cars at Collingwood, and their suffering condition, and the urgent necessity for prompt action to save them from perishing, it was necessary and proper that the cattle should be handled as they were by appellant, and driven to Painesville, and, as they were thirsty, their drinking to excess and the consequent injury could not be avoided.

9. Said mob would have been disbanded and all violent opposition would have ceased if appellant had consented to restore the reduction of wages, and to retain the striking employees in its service, but it refused to restore said reduction.

10. There was a sufficient number of competent men ready and willing to take the places of the strikers, at the reduced

wages, at any time, except for the violent opposition of the rioters and the fear of mob violence.

11. The first day at Painesville, the supply of water for the cattle was not sufficient, but this deficiency was promptly remedied; but the crowded condition of the cattle in the yards was not corrected, because it was reasonably supposed that the riot would cease, and that appellant would be able to carry the cattle to their destination without further delay, and' that it would be' unnecessary to enlarge the yards, or to cover the same to protect the cattle from the heat of the sun.

12. After eleven days from July 22d, 1877, the strike and riot ceased, and appellant's employees resumed work on its cars, and it was restored to the possession of all its property and railroad; and as soon as the riot ceased appellant shipped appellee's cattle to East Buffalo. If it had not been for appellant's employees, who had been such up to the commencement of the strike or riot, and who had not, during its continuance, been discharged by appellant, and who, at the expiration of the strike or riot, resumed their places as appellant's servants, the appellant could have overcome said resistance and carried appellee's cattle in due and ordinary time, and that the delay occurred by reason of the acts of appellant's employees. But, on account of the apprehension of danger and the overpowering violence of the mob, it was not reasonably prudent or practicable to discharge the strikers during the continuance of the riot.

13. Appellee was with his cattle from the time they were shipped at Kendallville until they arrived at East Buffalo; and he went with them from Collingwood to Painesville, at appellant's request, and under its promise to pay him for his services and all his expenses, as appellant's servant. His time was reasonably worth $22, and his expenses were $15 during the delay, and keeping his cattle in the yards at Painesville amounted to $40, which he paid and which had not been repaid to him. On account of the bruises and jaded condition of the cattle, and their injuries received as aforesaid, they

were largely depreciated in value, and were worth $433.50 less than they would have been if they had been carried to East Buffalo in ordinary time, and had not been bruised and otherwise injured. The appellee was not guilty of any negligence on his part.

Upon the foregoing facts, the court's conclusions of law were that appellee should recover of the appellant the sum of $40, paid by him for feed of his cattle at Painesville, and $22 for his services to appellant, and $15 for his expenses, and said sum of $433.50 for his damages, making an aggregate sum of $480.50, for which, and for his costs of suit, the appellee was entitled to judgment. The court also found, as a conclusion of law, that the appellant was not relieved by the acts of the rioters from its liability to appellee for the delay in transporting his cattle to East Buffalo, or for the injuries to his cattle.

In the outset of this opinion, it was said to be clear that the special findings of facts in this case were not founded upon the first paragraph of appellee's complaint. The reason for this statement is now obvious. In the first paragraph of his complaint the appellee counted exclusively upon an implied contract or agreement of the appellant, as a common carrier, and sought to recover damages for an alleged breach of its common-law duty as such carrier in the transportation of his cattle. No reference whatever is made in this first paragraph to any special or written contract between the parties for the carriage and delivery of appellee's cattle. When, therefore, the court found, as it did, that appellee's cattle were delivered to and received by the appellant under a special contract, which was at the time duly executed by the parties, it would seem that such finding would be an end of the case, as stated in the first paragraph of the complaint, and that no recovery could be had thereon. Especially so, when it was agreed in such special contract that the appellant " does not and will not assume or consent, as a common carrier, to transport livestock." In the face of this stipulation or limitation, agreed to expressly by the appellee, he can not, as it seems to us,

maintain his action against the appellant, as a common carrier, for any alleged breach of its common-law duty as such carrier in the transportation of his cattle. We are clearly of the opinion, therefore, that the facts specially found by the court do not, in any particular, sustain or support the averments of the first paragraph of appellee's complaint, and that there can be no recovery thereon.

We have given a full summary of the allegations of the second paragraph of the complaint, and it will be seen therefrom that the appellee has not declared therein upon the written contract between the parties, nor sought to recover damages for an alleged breach by the appellant of the stipulations of such contract. On the contrary, in this second paragraph, as in the first, he has sued the appellant, as a common carrier of cattle for hire, for an alleged breach of its common-law duty as such carrier, in the transportation of his cattle. The only substantial difference between the two paragraphs is the reference made to the written contract in the second paragraph, in substance, as follows.

"And the plaintiff further says that the distance from Kendallville station aforesaid to East Buffalo station is 388 miles, and by reason of the great distance and the nature of said property it was necessary that a person should accompany said cattle for the purpose of caring for and attending to them during the transit, and, for the purpose of so caring for and attending to said cattle during the transit as aforesaid, it was agreed by and between plaintiff and defendant, that plaintiff, without extra charge, should be carried by defendant without delay in the train of cars in which said cattle were to be transported from Kendallville aforesaid, to East Buffalo aforesaid; and that plaintiff should attend to and care for said cattle while being transported as aforesaid; and to that end and purpose the defendant executed, as did also the plaintiff, a contract in writing, a copy of which is filed herewith, whereby the defendant agreed and promised that plaintiff should have the care of said cattle while on the grounds of

the defendant, and while in transit, and should direct and control the handling and loading and unloading the same."

It is manifest, we think, that, by this mere reference to the written contract, the appellee did not intend to, as he did not in fact, declare upon such contract. In the second paragraph of his complaint, he did not allege that the appellant had contracted in writing with him for the transportation of his cattle, nor did he allege that the appellant had failed to perform the stipulations of such contract, on its part to be performed. The court found, as a fact, that the appellee's cattle were delivered to and received by the appellant, under a special written contract executed by the parties at the time; in which contract it was expressly recited that the appellant did not and would not assume or consent to transport live-stock as a common carrier. It was not competent for the appellee, as it seems to us, to ignore the written contract assented to and accepted by him for the transportation of his cattle, and to attempt, in direct contravention of the provisions of such contract, to hold the appellant liable in damages as a common carrier, for an alleged breach of its common-law duty as such carrier, in the transportation of his cattle. We are of the opinion that the case made by the court's special findings of fact is an entirely different case from the one stated by the appellee, in either of the paragraphs of his complaint. The appellee could only recover, if he recovered at all, upon and in accordance with the allegations of his complaint; and as the facts specially found by the court present an entirely different case from that stated by the appellee, in either paragraph of his complaint, we think that the court, as a conclusion of law upon its findings of fact, ought to have found for the appellant, the defendant below. *Indianapolis, etc., R. R. Co.* v. *Remmy*, 13 Ind. 518; *Excelsior Draining Co.* v. *Brown*, 38 Ind. 384, 388; *Jeffersonville, etc., R. R. Co.* v. *Worland*, 50 Ind. 339.

The court erred, as it seems to us, in its conclusions of law upon the special findings of fact, for another reason. The

fourth and eighth special findings of the court, the substance of which we have heretofore given, bring the case at bar fairly within the doctrine laid down by this court in *Pittsburgh, etc., R. W. Co.* v. *Hollowell,* 65 Ind. 188 (32 Am. R. 63). In the case cited, the court said : " In cases like the present, for delay in receiving and carrying the goods, the carrier is not an in- surer, and is bound only by the general rule of liability for a breach of his contract, or of his public duty as a carrier, and may be excused for delay in receiving the goods, or in transporting them after they have been received, whenever the delay is necessarily caused by unforeseen disaster which human prudence can not provide against, or by accident not caused by the negligence of the carrier, or by thieves and robbers, or an uncontrollable mob." And again, the court said : "The fact that a railroad company has reduced the wages of its employees can not be held to justify or excuse a mob, composed of indiscriminate persons, in stopping a train of cars, and delaying the receiving of goods, or the transportation of freights ; nor can the railroad company be held responsible for the consequences of such unlawful proceedings, when they cause such delay."

The judgment is reversed, at the appellee's costs, and the cause is remanded with instructions to set aside the conclusions of law, and to enter as a conclusion, upon the special findings of fact, a finding for the appellant, the defendant below, and to render judgment accordingly.

WOODS, J., dissents.

### ON PETITION FOR A REHEARING.

HAMMOND, J.—The petition for a rehearing having been overruled, the appellee has filed his petition, supported by a very earnest argument, asking that the order overruling his application for a rehearing be vacated.

We have re-examined the record and carefully compared it with the foregoing opinion, and find that the opinion contains a correct statement of the record. There can be no difference,

practically, whether the appellee bases his claim for recovery upon the appellant's liability as a common carrier or upon the express contract set out in the special findings of the court, as, in our opinion, such special findings of fact show that the appellant was not liable upon either ground. The appellee's loss resulted from causes over which the appellant had no control; and against which no care or prudence could have provided; and the special findings show that the appellee's property had all the care and attention that, under the circumstances, an ordinarily careful man would have bestowed upon his own property.

Without deciding whether, in any event, the appellee's present motion should be entertained, we are of the opinion that it should be overruled, for the reason that the conclusion reached by this court in its former opinion was correct.

Motion overruled.