STEWART ET AL. *v.* THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY.

[No. 2,523.   Filed November 30, 1898.]

CARRIERS.—*Shipper's Contract.—Signing After Shipment.—Limitation of Liability.*—Plaintiffs, under an oral agreement, arranged to ship a carload of stock over defendant's railroad, nothing being said as to the rate of freight to be charged.   Shortly after the car left the station, plaintiffs, without any fraud or concealment on the part of defendant, signed a shipper's contract, without reading it, which limited defendant's common law liability as a common carrier.   The freight rates under the written contract were less than usually charged when a shipper's contract was not signed.   *Held*, that the reduction of the freight charges was a sufficient consideration for signing the special contract, that all contemporaneous agreements were merged in the written contract, and that defendant's liability as a common carrier was thereby limited to the terms thereof.

From the Delaware Circuit Court.   *Affirmed.*

*Wagner, Bingham & Long*, for appellants.

*John W. Ryan* and *William A. Thompson*, for appellee.

BLACK, C. J.—In an action brought by the appellants against the appellee, the court below rendered judgment for the latter upon a special verdict.   The

question as to which party was entitled to judgment upon the verdict is alone presented for determination.

The verdict showed that the appellants were partners in the business of buying and shipping live stock, and had been so engaged for four years, at Daleville, Indiana, between which place and Cleveland, Ohio, and East Buffalo, New York, the appellee was a common carrier; that on the 19th of September 1895, the appellants delivered to the appellee, at Daleville, a carload of live stock, including sixty-six hogs, to be transported to East Buffalo, consigned to certain commission merchants there who were to act for the appellants in selling the stock. The verdict showed loss suffered by the appellants upon the hogs. The only question for our consideration being as to whether or not the shipment should be regarded as having been made under a certain written shipper's contract signed by both parties, by which the appellee's common law liability as a common carrier was limited, we need not recite more than those parts of the verdict which relate to that subject. On the evening of Wednesday, September 18, 1895, the appellants asked the appellee's agent at Daleville if if they could get a car to ship a load of stock to East Buffalo for Saturday's market. The agent answered, "I will try; I think I can." Nothing was said about the price or rate of freight to be paid for carrying the stock. The agent caused a car to be placed on the side-track by the chute of the stock pens at Daleville, and then notified the appellants, about half past two o'clock in the afternoon of September 19, 1895, that if they could load the stock at once, he could start them on a through freight train then just leaving Anderson, when the train should pass Daleville; and the appellants immediately loaded said stock, or caused it to be loaded, in said car, the agent know-

ing that they were doing so. The train arrived at Daleville about three o'clock on said September 19th, and the agent caused the car containing said stock of the appellants to be placed in said train, and the stock started in said train *en route* for East Buffalo at about a quarter past three o'clock in the afternoon of the same day. About fifteen or twenty minutes after the train had started, Hoppis, one of the two appellants, in connection with the shipment in controversy, signed their firm name to the shipper's contract in question. Besides the signatures at the foot of the contract, the appellants' firm name was also subscribed upon the back thereof under a heading setting forth the name of the appellee and the words "Live Stock Contract." Both of the appellants could read and write, and they had an opportunity to read the contract before signing it, but neither of them read it or knew its contents. The agent did nothing to prevent Hoppis from seeing and reading the contract, which, after signing, he voluntarily left with the agent, who never refused to give a copy thereof to the appellants; and three or four days after Hoppis signed the contract, he procured a copy thereof from said agent at Daleville. It was found that the through freight rate charged the appellants by the appellee for shipping said stock was sixteen cents per hundred pounds (which rate was stipulated in the contract, and stated therein to be a reduced rate), and that at the time of this shipment the rate of freight on live stock from Daleville to East Buffalo was sixteen cents when the shipper signed a shipper's contract. It was also found by the jury that when the shipper did not sign a shipper's contract, the rate was twenty per cent. higher, "but not practiced."

The appellants had been shipping stock at the aver-

age rate of about one carload a week from Daleville to East Buffalo, through the summer and immediately prior to this shipment, and sixteen cents per hundred pounds was the rate charged on all their prior shipments. When they made their prior shipments they signed, at the time of shipping, what is called the shipper's contract, "only part of the time," but "most of the time." It was found that the appellants did not know that the appellee required persons shipping live stock at the rate of sixteen cents per hundred pounds from Daleville to East Buffalo to sign a written "contract or bill of lading" limiting the liability of the appellee as a common carrier. Being asked if the appellee had any form of contract or bill of lading for the shipment of live stock from Daleville to East Buffalo, other than the one presented to the appellants and signed by them, the jury answered, "As to contract, no; but bill of lading, yes." It was also found that the appellee did not require all shippers of live stock from Daleville to East Buffalo to sign the same kind of contract or bill of lading as that signed in this instance.

The jury by answers to a number of interrogatories indicated that they regarded a shipment as not having been made under a shipper's contract unless it was signed by the shipper before the car left the station, and that they considered and concluded, and some of their answers were to the effect, that in the present instance the contract under which the stock was shipped was an "implied agreement" arising out of what had taken place prior to the departure of the train from the station, and not the written shipper's contract signed immediately after the train had started. The writing in question was not a bill of lading or receipt or mere memorandum, but was a contract signed by both parties.

The case does not seem to call for a determination of the question as to the proper effect to be given to evidence of the mere acceptance by the shipper of a bill of lading alone, or receipt signed by the carrier, either at the delivery of the goods or after the shipment thereof, the shipper being ignorant of the contents of the writing. There is no room here for denying the shipper's assent to the terms of the written contract.

The rule that a person who signs a contract without reading it or having it read to him cannot avoid it in the absence of fraud, misrepresentation or mistake, on the ground of ignorance of its contents, applies to such shipper's contracts as the one here in question. *Western R. Co.* v. *Harwell*, 91 Ala. 340, 8 South. 649. In *Black* v. *Wabash, etc., R. Co.*, 111 Ill. 351, it was said: "Where a party of mature years and sound mind, being able to read and write, without any imposition or artifice to throw him off his guard, deliberately signs a written agreement without informing himself as to the nature of its contents, he will nevertheless be bound; for in such case the law will not permit him to allege, as matter of defense, his ignorance of that which it was his duty to know, particularly where the means of information are within his immediate reach, and he neglects to avail himself of them." In *Kellerman* v. *Kansas City, etc., R. Co.*, 136 Mo. 177, 34 S. W. 41, it was said, that where a shipper, in the absence of fraud or deceit, signs a contract of shipment, he is conclusively presumed to know its contents, terms and conditions, and to have assented thereto. See, also, 5 Am. & Eng. Ency. of Law (2 ed.), 300, 301. In *Bostwick* v. *Baltimore, etc., R. Co.*, 45 N. Y. 712, it was said: "If the plaintiff had expressly assented to the terms of the bill of lading subsequently delivered to him, such assent would

operate as a change of the terms of the contract originally made, and under which he had parted with his property.   But after the verbal agreement had been consummated, and rights had accrued under it, the mere receipt of the bill of lading, inadvertently omitting to examine the printed conditions, was not sufficient to conclude the plaintiff from showing what the actual agreement was under which the goods had been shipped." In *Coles* v. *Louisville, etc., R. Co.*, 41 Ill. App. 607, it was said, that where the limitation of the liability of a railroad company as a common carrier is made by a condition in a bill of lading made as a receipt by the carrier, notice of the condition and assent to it by the shipper is a question of fact to be determined from the evidence; but where the limitation is contained in a contract signed by the shipper, the contract is to be construed by the court; its terms are binding so far as the carrier may contract in limitation of his duties; and a shipper signing such contract cannot relieve himself from its terms by reason of ignorance of the same, unless there be fraud and misrepresentation in the execution thereof.

The live stock in question was the property of the appellants when they signed the contract.   The consignee was their agent to dispose of the property for them at East Buffalo.   The appellants had power to bind themselves by their contract relating to the property.   Their suit proceeds upon the theory and the express averment of the complaint, that they were the owners of the hogs.   There does not appear to have been any mistake of fact or any fraudulent practice, or any imposition of any kind upon the appellants.   No advantage appears to have been sought or obtained by and through the time and manner of executing the contract.   The appellants must be treated as chargeable with knowledge of the contract

which they voluntarily signed, and must be regarded as assenting to its terms.

A contract, whether one signed by the shipper or a bill of lading assented to by him, expressing the terms and conditions upon which the property is to be transported, is to be regarded as merging all prior and contemporaneous agreements of the parties, and, in the absence of fraud, concealment or mistake, its terms or legal import, when free from any ambiguity, cannot be explained or added to by parol. *Louisville, etc., R. Co.* v. *Wilson,* 119 Ind. 352; *Pennsylvania Co.* v. *Clark,* 2 Ind. App. 146. It is true, the rule that all prior and contemporaneous oral negotiations are merged in a written contract is not applicable where the oral negotiations in question are other than such as relate to the contract which is reduced to writing and lead up to it. But a complete and operative oral contract may be superseded for the future by a substituted written contract, or a written contract may be changed or abrogated by an oral agreement. *Toledo, etc., R. Co.* v. *Levy,* 127 Ind. 168; *Louisville, etc., R. Co.* v. *Craycraft,* 12 Ind. App. 203, and cases cited. The cancelation of a prior oral contract is sufficient consideration for a substituted written one. *Leonard* v. *Chicago,. etc., R. Co.,* 54 Mo. App. 293.

But in the case before us the contract seems to us to have been signed by the appellants in due course of business, the signature being the concluding act on their part toward which all that had gone before led up. The property to be shipped was not of such character that it could be delivered by the shipper in the carrier's depot to be loaded by the carrier. It was in stock pens and was loaded by the shippers in a car, which was attached to a train in anticipation of the arrival of which the car was loaded, and the

train departed within a short time after its arrival, and within as short a time thereafter the contract was signed. The question is not one as to what would have been the effect if the shippers had refused to sign the contract, but it is one of voluntary agreement to the terms of the written contract, made substantially at the time of the shipment, all the oral negotiations being merged therein. The idea of a suggestion to the contrary would seem to have been an afterthought.

A contract limiting the common law liability of the carrier must be supported by a consideration, and there is not a sufficient consideration for a stipulation so exempting the carrier where the services rendered by the carrier and the charges for carriage are in no respect different from what they would be if there were no special contract. Whatever may be the correct rule as to the burden of proof in relation to the consideration, in the case before us it affirmatively appears that the rate of freight which was specified in the contract assented to by the shipper was a reduced rate. It appears that while the carrier had in use but one form of shipper's contract, it also had bills of lading. It is found that in most of the prior shipments of stock by the appellants they had signed the shipper's contract, but in some cases (for what reason does not appear) had not done so, though they always paid the same rate of freight. It was also found that the carrier did not require all shippers of live stock to sign the same kind of contract as that here in question, but it does not appear upon what terms or at what rates the other shippers here referred to contracted with the carrier. It was also found that the regulation that when the shipper did not sign a shipper's contract the rate was twenty

per cent. higher was "not practiced." These vague findings are not necessarily inconsistent with the fact that the carrier, consistently with its reasonable regulations, shown to exist, might have charged a higher rate than that stipulated in the contract of appellants, if they had not signed that contract and had contracted for the transportation of their stock by the appellee without any limitation of its common-law liability. In *Schaller* v. *Chicago, etc., R. Co.*, 97 Wis. 31, 37, 71 N. W. 1042, it was said: "If the rates for the carriage of freight were fixed by a general rule of the company, with reference to exemption from some common law liabilities, the fact that in some or many cases receipts containing such exemption were not given is not material."

The appellants did not base their complaint upon a written contract. When the action is upon a contract not in writing and the contract appears on trial to be a written one, there can be no recovery. "Parol evidence must have been excluded, because of the written, and the written, because not sued on." *Indianapolis, etc., R. Co.* v. *Remmy*, 13 Ind. 518. It is the established rule in this State, that where the action is upon an implied contract or for an alleged breach of the carrier's common law duty, and it is found on the trial that the goods were shipped under a special written contract limiting the common law liability, the plaintiff cannot recover. *Lake Shore, etc., R. Co.* v. *Bennett*, 89 Ind. 457; *Hall* v. *Pennsylvania Co.*, 90 Ind. 459; *Bartlett* v. *Pittsburgh, etc., R. Co.*, 94 Ind. 281; *Snow* v. *Indiana, etc., R. Co.*, 109 Ind. 422; *Indianapolis, etc., R. Co.* v. *Forsythe*, 4 Ind. App. 326; *Baltimore, etc., R. Co.* v. *Ragsdale*, 14 Ind. App. 406. The judgment is affirmed.