LOUISVILLE & N. R. CO. *v.* UNITED STATES IRON CO.

(*Nashville.* December Term, 1906.)

1. **CONTRACT.** Optional as to one party. Not void for want of mutuality. Question reserved.

   It has been held in Tennessee that the fact that a contract is optional as to one of the parties, and obligatory as to the other, does not render it void for want of mutuality, if there be a sufficient consideration on both sides, and, until such option is exercised, the contract is binding upon both parties; but the decision of this question, as applicable to the contract involved in this case, is expressly reserved.

   Cases cited: Cherry v. Smith, 3 Humph., 19; Bradford v. Foster, 87 Tenn., 9.

2. **SAME.** Pleading and practice. Where no issue made in pleadings as to validity of contract sued on, court precluded from considering.

   In a suit to recover an amount expended under a contract, which is made the foundation of the action, where no issue is made in the pleadings respecting the validity of the contract, but the contentions of the respective parties were waged alone upon a proper construction thereof, the supreme court, on appeal, is precluded from considering the question as to whether or not the contract was void for want of mutuality.

   Cases cited and approved: O'Bryan Bros. v. Glenn Bros., 91 Tenn., 110; Gernt v. Cusack, 106 Tenn., 150.

3. **ESTOPPEL.** Inconsistent positions. One cannot claim benefit under an instrument and at same time seek to defeat it.

   One who claims the benefits of an instrument, whether it be a will or a contract, must abandon every right the assertion of which would defeat, even partially, the provisions of the instrument. A party cannot occupy inconsistent positions, but will be confined to his election.

Railroad v. Iron Co.

4. **CONTRACTS.** Intention of parties is governing consideration in construction of.

The intention of the parties is the governing consideration in the construction and interpretation of all contracts.

5. **SAME.** To "maintain" railroad obligates party to reconstruct bridge destroyed by extraordinary freshet. Case in judgment.

A contract for the construction and operation of a branch railway from complainant's railroad to defendant's mines provided that defendant should build the substructure and complainant should build the superstructure and "maintain and operate" said branch railroad. The railroad was built accordingly, and was operated for a time, but a bridge erected by defendant, under its contract to build the substructure was washed away by an extraordinary freshet. Held, that complainant was obligated to reconstruct the bridge, under its contract to "maintain" said branch railway, though the bridge, when erected, would become defendant's property—the contract providing that the substructure shall remain defendant's property.

Case cited and approved: Commonwealth v. Deerfield, 6 Allen (Mass.), 456; People v. Board of Supervisors, 142 N. Y., 271; Dyer Co. v. Railroad, 87 Tenn., 714; North Staffordshire R. R. v. Dale, 8 Ellis & Bl. (Q. B.), 836.

Case cited and disapproved: Kadderly v. Multnomah County, 32 Or., 560.

Case cited: L. & N. Rwy. v. Godman, 104 Ind., 490.

---

FROM LAWRENCE.

---

Appeal from the Chancery Court of Lawrence county.—W. S. BEARDEN, Chancellor.

JOHN BELL KEEBLE, for Railroad Co.

C. C. TRABUE, for Iron Co.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

The principal question presented on this record is in respect of the proper construction of a contract entered into between the Louisville & Nashville Railroad Company and the United States Iron Company for the construction of a railroad known as the "Tennessee & Alabama Mineral Railway."

It appears that in December, 1899, the iron company was the owner of certain mines and ore banks in Lawrence county, situated about eight miles from the Florence & Sheffield Division of the Louisville & Nashville Railroad company. The iron company was desirous of marketing its ore, and entered into negotiations with the Louisville & Nashville Railroad Company for the purpose of providing shipping facilities. It was deemed financially advantageous to both companies that the Louisville & Nashville Railroad should extend its road by a branch line to the iron mines. An oral contract was entered into between these companies, by which the iron company undertook to procure the right of way for the proposed branch railroad, and to procure a charter for the incorporation of a railroad enabling it to condemn a right of way, and the iron company also undertook "to grade and prepare the roadbed of said branch

railroad for the superstructure in a manner satisfactory to the railroad company," and to "erect a plant on said Smith ore bank and open the mines, with sufficient capacity to mine and ship not less than 750 tons of ore per day."

The Louisville & Nashville Railroad Company upon its part agreed to furnish cross-ties and other track material and the necessary labor to lay the track on said branch railroad, and to maintain and operate the same for the purpose of transporting the ore of said iron company for the said Smith ore bank. The distance the branch railroad was to be constructed was eight miles.

It was in like manner agreed that, if for any reason the mining or shipping of ore from said Smith ore bank over said branch railroad should be abandoned, the railroad company should have the right, without further notice or proceedings, to remove the track material on said branch railroad.

It was also stipulated that the rate for the transportation of ore from the mines from the said Smith ore banks to be opened on the said branch railroad to Florence, Ala., and Sheffield, Ala., should not be less than thirty cents per ton of 2,240 pounds.

It further appeared that in pursuance of said agreement the iron company caused to be procured from the State of Tennessee a charter of incorporation of said branch railroad, under the name and style of the "Tennessee & Alabama Mineral Railway." The right of way

was procured by said Tennessee & Alabama Mineral Railway for said branch railroad in the county of Lawrence, and it built thereon the substructure for said branch railroad, a distance of seven miles and 1,715 feet.

It further appears that in accordance with the oral agreement entered into between the parties the Louisville & Nashville Railway Company subsequently built the superstructure upon said branch railroad.

It was further stipulated that the property placed upon said branch railroad by the Louisville & Nashville Railroad should remain its property, free from all claims of any kind of the iron company and of the Tennessee & Alabama Mineral Railway. The oral contract between these companies was entered into on the 29th of December, 1899, but was reduced to writing August 29, 1900, embodying all the facts which have just been stated.

It further appears that the. Louisville & Nashville Railroad took charge of the newly constructed road and operated it until the 28th of March, 1902, when, on account of a very extraordinary flood in Lawrence county, an iron bridge across Shoal creek, on said branch railroad, together with its piers, abutments, etc., was washed away and destroyed.

The court of chancery appeals finds that after this flood, and the damage resulting, negotiations took place between the Louisville & Nashville Railroad Company and the iron company looking to the renewal of the bridge; each company insisting that the other was

onerated with the duty of replacing the bridge and re-
pairing the damages.   Finally, after considerable cor-
respondence, the vice president of the Louisville &
Nashville Railroad proposed to construct a new bridge
across said creek as promptly as practicable; this action,
however on the part of his company, to be without pre-
judice to the rights of either party in the subsequent
adjustment of the question of liability.   This proposal
was accepted by the iron company.   The Louisville &
Nashville Railroad accordingly reconstructed the bridge
under this proposition at a cost of $8,996.72, and ex-
pended for other repairs on the railroad rendered neces-
sary by said flood the sum of $1,676.89.   This bill was
filed by the Louisville & Nashville Railroad Company
to recover of the iron company the amount so expend-
ed.

The chancellor adjudged that the iron company was
liable under the contract for the expense incurred in re-
constructing the bridge over Shoal creek, and pronounc-
ed a decree against defendant in favor of complainant
for said sum, with interest, amounting altogether to
$10,469.17.   The chancellor, however, disallowed the
item of $1,676.86 expended by the Louisville & Nash-
ville Railroad in repairing other damages to the branch
railroad.

The court of chancery appeals was of opinion that
defendants were not liable to the Louisville & Nash-
ville Railroad for the cost of renewing said bridge, and
the other items of expense incurred in repairing damages

to the branch railroad, and accordingly dismissed bill, reversing, as already seen, the decree of the chancellor. The Louisville & Nashville Railroad Company appealed, and has assigned as error the action of the court of chancery appeals in dismissing its bill.

The court of chancery appeals was of opinion that the duty of reconstructing the bridge over Shoal creek devolved on the Louisville and Nashville Railroad under a proper construction of the following clause contained in the written contract between the parties, viz.:

"The railroad company upon its part in like manner agrees to furnish cross-ties and other track material and the necessary labor to lay the track on said branch railroad, and to maintain and operate the same for the purpose of transporting the ore of said iron company from the said Smith ore bank."

The first contention made on behalf of the Louisville & Nashville Railroad Company is that it was not onerated with any duty to reconstruct said bridge, for the reason that said contract is void, for want of mutuality, first, in that it did not bind the iron company to ship any specific quantity of ore, and, second, because the iron company alone had the option to terminate the contract at any time by abandoning the mine and shipping of ore.

An able argument, citing many authorities, has been submitted by counsel in support of this contention. It is said on the brief that there is no period of time fixed during which the contract should continue, as also:

"That while the railroad company had agreed upon the rate of transportation of ore from the mines to Florence and Sheffield, Alabama, and to maintain and operate the branch railroad for the purpose of transporting such ore; that the iron company nowhere obligated itself to furnish any ore for shipment, but is given the right at any time for any reason to abandon the mining and shipping of ore from this branch railroad."

It is said, however, by counsel for defendant, that the contract expressly provides as follows:

"It was in like manner agreed that the iron company would erect a plant on said Smith ore bank and open the mines with sufficient capacity to mine and ship not less than 750 tons of ore per day. It is said that a legal and reasonable interpretation of the contract is that the iron company was onerated with the duty of prosecuting its mining operations with ordinary diligence, and with the obligation to ship its product over this branch railroad and that a failure to do so would terminate the contract upon the ground of an abandonment."

Again, it is said that, even if the iron company alone had the option to terminate the contract by abandonment of its mining operations, this fact would not affect the validity of the contract. Page on Contracts, vol. 3, section 1360, is cited as follows:

"A contract may contain an express provision that one or either party may terminate such contract at his option. . . Full effect is given to such provisions, and the exercise of such option operates as a discharge

of the contract. Until such option is exercised, the contract is binding upon both parties."

In *Cherry* v. *Smith*, 3 Humph., 19, 39 Am. Dec., 150, a suit was brought on a contract binding defendant to ship and forward to plaintiff "a number of barrels of salt, not to exceed 150 pounds, when called on, at the rate of fifty cents per bushel," etc. The contract did not require plaintiff to take any quantity of it at all and at no particular time. It was insisted that the contract was not binding, "because there is no mutuality and because it is *nudum pactum.*" The court said:

"We think there is mutuality in this contract. The fact that the agreement is optional as to one of the parties and obligatory as to the other does not destroy its mutality. If there be a sufficient consideration on both sides, it is mutual. The stipulation here is by the one party that he will deliver the salt when called on, and by the other that he will pay for the salt when so delivered at fifty cents per bushel. This constitutes mutuality. These promises, one in consideration of the other, are sufficient to make the contract binding," etc.

This case was reaffirmed in *Bradford* v. *Foster*, 87 Tenn., 9, 9 S. W., 195. However, in the state of the pleadings, we do not feel called on to decide this question, since no such issue is presented; but, on the contrary, complainant bases its right to recover upon said written contract, and it has thereby affirmed the validity thereof.

The bill alleges that:

"Your complainant entered into a contract with the said defendant . . . whereby the said defendant agreed . . . . . It was in like manner agreed . . . It was also agreed . . . It was further and in like manner agreed that this complainant . . . ; that in pursuance of said agreement the said defendant iron company did. . . . , and did . . . . ; and the said iron company . . . ; and that after this was done this complainant did, in accordance with its agreement in that behalf, . . . and did . . . . Complainant herewith files, as Exhibit A to, and a part of, this bill, a copy of said contract for the inspection of the court, and reference is hereby made to all the stipulations and terms thereof, the same as if they were incorporated in this bill in so many words."

It is then alleged:

"That under the said contract it became and was the duty of the defendant to rebuild said bridges; . . . but, this plaintiff being able to do the work more conveniently and with less expense, . . . at the special instance of the said defendant iron company . . . rebuilt said bridges and trestles, . . . thereby putting said bridge and road in condition where it could be and now is being operated under said contract."

It thus appears that the present bill is filed to recover the amount expended under the contract, and the written contract is exhibited with the bill. It is made the foundation of the action. The iron company and its codefendants in their answer "deny that it was their

duty, or the duty of either of the respondents, to re-build or repair said bridge, trestles, etc., but charged that this obligation rested alone upon complainant."

It thus appears that no issue was made in the plead-ings respecting the validity of the contract, and the contentions of the respective parties were waged alone upon a proper construction of the contract as to the liability fixed for the renewal and reconstruction of the bridge.

We are therefore of opinion that we are precluded from adjudicating this question. Am. & Eng. Encyc. Pl. & Pr., vol. 7, p. 362-4; *O'Bryan Bros.* v. *Glenn Bros.,* 91 Tenn., 110, 17 S. W., 1030, 30 Am. St. Rep., 862; *Gernt* v. *Cusack,* 106 Tenn., 150, 59 S. W., 335.

In Herman on Estoppel, 171, it is said:

"One entitled to a benefit under an instrument, whether it be a will or a contract, if he claims the bene-fits of such instrument, he must abandon every right the assertion whereof would defeat even partially the provisions of the instrument. A party cannot occupy inconsistent positions, but will be confined to his elec-tion."

The second and third propositions urged on behalf of the Louisville & Nashville Railroad are:

"(2)   Under a fair and just interpretation of the provisions of said contract, no duty rested upon the rail-road company to rebuild or replace the bridge and other substructure destroyed by the flood of March, 1902.

"(3)   Under the provisions of said contract, the duty

rested upon the iron company to build the substructure and rebuild and replace any that might be destroyed."

The provisions of the contract upon which the solution of the determinative issue presented on the record depends are as follows:

"The railroad company upon its part in like manner agreed to furnish cross-ties and other track material and the necessary labor to lay the track on said branch railroad, and to maintain and operate the same for the purpose of transporting the ore of said iron company from the said Smith ore bank."

It is correctly assumed by counsel that the intention of the parties is the governing consideration in the construction and interpretation of all contracts. We agree with counsel that the iron company entered into this contract for the purpose of securing a means of transportation for its ore from its mines to Florence and Sheffield, Alabama, and that the railroad company entered into the contract for the purpose of reaping the revenue which would be derived from the operation of this branch railroad in the transportation of the ore of the iron company. After providing for the laying of the substructure of the railroad by the iron company and the building of its superstructure by the Louisville and Nashville Railroad Company, the latter railroad company, was obligated to maintain and operate the same. What, then is the legal interpretation of the term "maintain," as employed in this contract?

The bridge over Shoal creek was washed away by an

unprecedented flood, for which, of course, neither party to the contract was chargeable. The bridge was origin- ally constructed by the iron company under its obliga- tions to erect a substructure for the branch railroad. While the extraordinary freshet which destroyed this bridge was not within the contemplation of the parties, they, of course, were bound to foresee that in course of time both the substructure and superstructure would require repairs. The railroad company assumed the obligation to maintain the branch railroad. Does that obligation extend merely to ordinary repairs incident to the operation of the railroad, or does it also include renewal and reconstruction of such parts as might be entirely destroyed? If the latter construction is prop- er, then it follows, as insisted by counsel for the rail- road, that company would be onerated with the burden of rebuilding the entire road in the event of its destruc- tion. We think this contingency must also be included if the construction of the term "maintained" contended for by the iron company is to prevail.

It is said on behalf of the Louisville & Nashville Rail- road that the revenue to be derived from this branch railroad was not such as would justify the railroad in assuming the entire construction of the seven or eight miles required to reach the ore banks of the iron com- pany. Hence, it is said the iron company agreed to pro- vide the substructure, thus dividing the outlay of money necessary to the building of the branch railroad.

It is further argued that the manifest intention of the

parties as disclosed by the written contract was that the substructure provided by the iron company should at all times remain the property of that company, while the superstructure provided by the railroad should at all times remain the property of the railroad company.

If for any reason the operation of the mines was abandoned, or the transportation of the ore from the branch railroad was discontinued, the railroad company was to have the right to remove its superstructure, and the substructure would remain the property of the iron company or of the branch railroad.

It is true the contract provides that the property "placed upon said branch railroad by the railroad company is and shall remain the property of the Louisville & Nashville Railroad Company, free from all claims of any kind of the iron company and of the Tennessee & Alabama Mineral Railway, subject to all the foregoing recited considerations."

It is further argued that, if this court should determine that it was the duty of the railroad company under the contract to build this bridge, the prime object which the parties had in making the contract of August 29, 1900—that is to say, that the property which the railroad company placed upon the branch railroad should at all times remain the property of the Louisville & Nashville Railroad Company—must be defeated, because, whenever the railroad company is required to rebuild the bridge and trestles and other substructure which was destroyed, that substructure immediately

becomes the property of the iron company or the mineral company, and all interest that the railroad company has in the same passes forever from it.  But if the term "maintained," as used in this contract, obligates the Louisville & Nashville Railroad Company to renew, replace, and reconstruct parts of the substructure which may be destroyed, we do not perceive how that construction should be defeated by the fact that the portions renewed would become under the original contract the property of the iron company.  So at last the solution of the question now presented must depend upon the legal interpretation of the term "maintained," regardless of the consequences that may flow from such construction.

It is insisted in behalf of the railroad company that the word "maintain," as used in the contract, only applies to the superstructure, and that the railroad company was onerated with the duty of maintaining the superstructure originally constructed by it.  Counsel, in support of his argument, quotes the testimony of Mr. Brooks, an expert witness, defining the meaning of "substructure" and "superstructure" of the railroad as mentioned in the contract between these parties, and that witness expresses the opinion that bridges are comprehended within the definition of a substructure.

The court of chancery appeals in its supplemental opinion declines, as requested for additional findings, to set out substantially and literally the deposition of

Railroad v. Iron Co.

T. E. Brooks, the witness for complainant in this case. That court, however, reports:

"There is no dispute as to what constitutes in railroad parlance the substructure and the superstructure of a railroad. The substructure is the embankment, cuts, fills, and other things necessary to make up the road-bed. The superstructure consists of the cross-ties, rails, etc., necessary for the operation of trains over the road." "This" says that court, "is a general outline of the distinction between the two."

It will be observed, however, that that court fails to find specifically whether a bridge is a part of the substructure or the superstructure of a railroad. That court reports that after this road was constructed, both the substructure and the superstructure, it was the duty of complainant under the contract to maintain and operate it, and in its opinion this means keep it in a condition to be operated as a railroad.

In the view we have taken of this case it is unnecessary to determine whether the railroad company or the iron company was onerated with the duty in the first instance of building the bridge over Shoal creek, and whether said bridge was a part of the substructure or superstructure of said branch railroad, since the contract provides that, after the substructure and superstructure are completed, it shall be the duty of the railroad company to maintain and operate the same for the

purpose of transporting the ore of said iron company from the said Smith ore bank.

It will be observed that the obligation of the railroad company is not to maintain the bridges or trestles or any specific portion of the construction, but it is to maintain and operate said branch railroad. Of course it could not comply with this obligation and operate the branch railroad, unless it is provided with rails and trestles and bridges; and, if one or all of these necessary parts of a railroad are destroyed, then the railroad company is obligated with the duty to replace, renew, and reconstruct said destroyed parts in order to maintain and operate the branch railroad. It could not be maintained and operated at all as a branch railroad, unless all of its essential and component parts are intact.

As opposed to the construction that the word "maintain" is a convertible equivalent to "renew," "replace," or "reconstruct," counsel for complainant cites the case of *Kadderly* v. *Multnomah County*, 52 Pac., 515, 32 Or., 560. In that case, it appeared that the legislature of Oregon passed an act requiring the city of Portland to acquire certain bridges and ferryboats to cross Willamette river, and when so acquired, they should be turned over to Multnomah county, which, in the language of the statute, "should assume and take complete possession and control of all bridges and ferries now owned and operated by said city of Portland, or which may be acquired under the provisions of this act, and said

county court of Multnomah county shall maintain and operate the same."

The question arose whether, under a proper construction of the words "maintain and operate the same," employed in the statute, the county court of Multnomah was charged with the duty of reconstructing certain bridges which had fallen into decay and become unfit for use.  Said the supreme court of Oregon:

"The same stress is put upon the word 'maintain,' and it is thought that it is broad enough to require the county to rebuild or reconstruct or supply the necessary instrumentalities to keep such boats and ferries in operation.    But we think its significance here the ordinary one—to keep up, sustain, preserve."

Continuing the court said:

"The purport of the language is to maintain, manage, keep in repair.  This is not broad enough to include or comprise the complete rebuilding or reconstruction of a bridge or boat, or to replace either with an entirely new one after the old had fallen into decay or had been destroyed."

In the case of *Louisville & Nashville Railway* v. *Godman,* 4 N. E., 163, 104 Ind., 490, the court said:

"The word 'maintain,' used as a verb, does not mean to provide or construct, but, as defined by lexicographers, means 'to keep up; to keep from change; to preserve.' Worcester's Dictionary.  'To hold or keep in any particular state or condition; to keep up.' Webster's Dictionary.    The Century Dictionary defines the word

'maintain:' 'To hold in an existing state or condition; keep in existence or continuance; preserve from lapse, decline, failure, or cessation; keep up.' Standard Dictionary defines the word: 'To hold or preserve in any particular state or condition.'"

On the other hand, in *Commonwealth* v. *Inhabitants of Deerfield,* 6 Allen (Mass.), 456, it appeared that a bank at the west end of a bridge had been swept away by an unusual freshet a distance of about one hundred feet. The question arose with respect of the obligation of the bridge company, under its duty to maintain, to construct an extension of its bridge. The court said:

"We are of opinion that when a flood in the river has washed away a part of its banks, and so widened the bed of the stream, the obligation of a corporation having the franchise of a toll bridge across the river to maintain and keep its bridge in repair will require the extension of a bridge to the new bank thus created, if there is no other limitation of the franchise."

In *People* v. *Board of Supervisors,* 36 N. E., 1063, 142 N. Y., 271, it was held that a statutory obligation to "maintain" a bridge imposed the obligation, where the bridge "had become out of repair and was taken down and destroyed," to restore and rebuild it. *Dyer Co.* v. *Railroad,* 87 Tenn., 714, 11 S. W., 943.

In the case of *North Staffordshire R. R.* v. *Dale,* 8 Ellis & Bl. (Q. B.), 836, the question arose as to the meaning of the word "maintain," used in section 46 of the railway clauses act (St. 8 Vict., c. 20), requiring

Railroad v. Iron Co.

railway companies crossing public highways to construct underhead or overhead bridges and to maintain the same. It was the contention of the railway company in that case that it was only required to maintain the substructure or fabric of the bridge. Lord Campbell, C. J., held otherwise, saying:

"I cannot imagine language more conclusively creating an obligation. What is to be done in the first instance? It is said that the act distinguishes between the substructure and the superstructure. But clearly the obligation which it imposes is not discharged by merely putting arches. The work must be complete, so as to be fit for passage of carriages. Until then the act is not complied with. But, when constructed, it is to be maintained; and the road, as well as the substructure, was to be made. I, therefore, find nothing to interfere with the clear construction of section 46. There is no inconvenience; on the contrary, the inconvenience would be the other way, if different bodies had to maintain the bridge and the road. It is much more convenient that the maintenance of the fabric and of the road over it shall be in the same hands."

In Johnson's Universal Encyc. (1897) "maintenance of way" is defined as the department of a railway organization which has charge of the repairs and renewals of the roadbed, track, bridges, and buildings.

Many other authorities construing similar language in covenants of lease have been cited by both parties. But we do not lay much store by any of the authorities

cited, since the construction of the language involved depended upon the intention of the parties and the context of the instrument.   We have applied this rule in the construction of the term "maintain" as employed in this contract, and have reached the conclusion that the railroad company was onerated with the duty of reconstructing this bridge, and that it is, therefore, not entitled to recover from the iron company the expenses so incurred.

The decree of the court of chancery appeals, dismissing complainant's bill, will be affirmed.