## S. L. BAUMAN v. PICKWICK GREYHOUND LINES, INC.

Western Section. November 13, 1931.

Petition for Certiorari denied by Supreme Court, March 5, 1932.

C. M. Bryan and Ewing, King & King, all of Memphis, for plaintiff in error.

Lake Hays, of Memphis, for defendant in error.

OWEN, J. S. L. Bauman, the plaintiff, below has appealed from a judgment of the Circuit Court of Shelby County, wherein his suit was dismissed; his suit was based on an alleged breach of contract. At the conclusion of plaintiff's proof, a motion for a directed verdict on behalf of the defendant was sustained. A motion for a new trial was seasonably filed, overruled, an appeal perfected, and the plaintiff has assigned two errors. By these errors it is insisted that the court erred in directing a verdict for the defendant for the reason that the court erroneously construed the contract sued on:

1st. As one which contained a condition limiting the liability of the defendant, Pickwick-Greyhound Lines, Inc., when the condition was one limiting the liability of the plaintiff, S. L. Bauman. The liability of the Pickwick-Greyhound Lines, Inc., was not made to depend upon any condition, but the liability of the plaintiff was expressly made to depend upon a certain condition, so that the plaintiff was the only person who could take advantage of this condition.

2nd. If the plaintiff was under any liability to secure permits from the City of Memphis, he had discharged his full liability. All contracts are to be construed for the purpose of effectuating the intent of the parties, and the clear intent of the parties in this contract was that the Pickwick-Greyhound Lines should be authorized to use the building in question as a bus terminal, and to bring their buses into and out of this building. A permit to use the building as a bus terminal was obtained, and there was no obstacle to its use as a bus

terminal and to the bringing of buses into and out of it over Third Street or any other street.

The contract or agreement upon which this lawsuit was founded is as follows:

"Memphis, Tennessee,
"March 12, 1929.

"PICKWICK-GREYHOUND LINES, INC.,

"I hereby offer to lease to you when secured by me the first floor of building located at Nos. 86-92 North Second Street, Memphis, Tennessee, which was formerly occupied by the Memphis Steam Laundry, for a period of ten years from DATE OF COMPLETION at a rental of $1000 per month, payable monthly in advance.

"I agree to make any changes in the said first floor as suggested by you, provided these changes do not cost more than the changes and plans shown on drawing made by E. L. Harrison, Architect, a copy of which you have. Those changes are to be completed within a reasonable time from the date of the signing of the formal contract and lease hereinafter provided for.

"My obligations hereinabove assumed are entirely contingent on my ability to secure a permit from the City of Memphis to use said building as a bus terminal and on the City's giving to bus lines a right to use Third Street in the transportation of their freight and passengers. A meeting of the City Commission has been called to impose certain restrictions on the operations of bus lines in the City of Memphis and it is not now definitely known what these restrictions and limitations upon their rights will be. I will use my best efforts to secure the permit to use this building as a bus terminal and have the City permit bus lines to operate on Third Street.

"But if I should fail to secure either of them, then this offer is to have no effect. I am to have a reasonable time in which to do these things.

"If I succeed, then a formal lease and contract will be entered into between you and me setting our more fully the agreements as hereinabove stated.

"S. L. Bauman (Signed)

"ACCEPTED:

"H. H. Morgan, Gen. Mgr. (Signed)

"for Pickwick-Greyhound Lines, Inc."

On May 25, 1929, the defendant directed the following letter to the plaintiff:

"Mr. J. S. Bauman,
"290 Strathmore,
"Memphis, Tennessee.
"Dear Sir:
"Referring to the contract on the proposed tentative agreement in regards to building of a terminal building in Memphis at location of 86-92 North Second Street.

"I find certain conditions that have not been followed out and up to the present date no definite action is in evidence.

"Be advised that we feel sufficient time has been allowed for such things to take place. Therefore, we withdraw our offer to rent same property as of this date.

"PICKWICK-GREYHOUND LINES, INC.

"H. H. Morgan (Signed)

"H. H. Morgan,

"General Manager.

"HHM/rg
"Dict. 5/24/29
"cc-Hays
    "Lerner"

It appears that shortly after the execution of the agreement between the parties, which was in the matter of a letter written by the plaintiff, setting forth certain terms and conditions in regard to leasing a building on Second Street, which building was to be improved to the satisfaction of defendant company. An architect was engaged, plans and specifications were made and defendant ordered certain alterations or changes to be made. These changes to be made were agreeable to the plaintiff. The plaintiff employed Mr. E. L. Lerner, a prominent member of the Memphis, bar, who undertook to get a permit from the City of Memphis, for the erection of a bus terminal, and also get the permission of the city to allow the defendant's buses to use Third Street.

It appears that it was the intention and desire of the defendant to have the front part of the building for a bus terminal, facing on Second Street, to be used as a waiting room for bus passengers, white and colored, and the defendant wanted its buses to enter the bus station from the rear, and that was why or the reason that it was anxious to use Third Street for the operation of its buses.

At the time of the execution of this agreement, it appears that the city authorities, including the mayor and city commissioners, had under discussion the matter of imposing certain restrictions on the operation of bus lines in the City of Memphis, and it was not known what these restrictions and limitations, as to the use of buses would be.

Mr. Lerner, after many meetings with the city commissioners, especially Mayor Overton, Commissioner Davis and Commissioner of Streets, Jackson, procured a permit for the bus station at 86-92 North Second Street. He says the commissioners or officials were at first very much opposed to a bus terminal being located on the property at 86-92 North Second Street, but they finally granted the permit, but would take no action as to the use of Third Street. They wouldn't grant his request and they did not deny the request, evidently postponing the matter, and the attorney for the plaintiff and the city authorities came to no definite understanding prior to the letter of May 25th, in which the defendant withdrew its offer to rent the property at 86-92 North Second Street. No further negotiations were had between the defendant and plaintiff after receipt of this letter of May 25th.

The plaintiff had paid $1000 for an option to buy the property that he was leasing to the defendant. For business reasons, the option was taken in the name of I. L. Myers, a friend of the plaintiff, and Myers was acting as agent for the plaintiff.

On April 1, 1930, the City of Memphis, through its officials, finally passed an ordinance, regulating bus terminals, and also regulating the use of buses or motor vehicles on the streets of Memphis. The passage of this ordinance was putting into effect definitely that clause of the contract which refers to ''a meeting of the city commission has been called to impose certain restrictions on the operation of bus lines in the City of Memphis, and it is not now definitely known what these restrictions and limitations upon their rights will be.'' The plaintiff agreed that he would use his best efforts to secure the permit to use this building as a bus terminal and have the city permit bus lines to operate on Third Street.''

''But if I should fail to secure either of them, then this offer is to have no effect. I am to have a reasonable time in which to do these things.''

The contract or agreement further provided that, ''if the plaintiff succeeded, then a formal lease would be executed.''

We copy from the city ordinance certain portions, which in our opinion have a bearing on this lawsuit; omitting the caption of the ordinance, the preamble is as follows:

''Whereas, the safety and welfare of the residents of this city and the efficiency of its fire department depend upon the proper regulation of traffic, and

''Whereas, bus transportation, in order to be useful and efficient, must be so regulated as to interfere as little as possible with the general traffic of the city, and

"Whereas, there is a rapid development in bus transportation and motor-vehicle freight transportation,

"Now, therefore, be it ordained by the Board of Commissioners of the City of Memphis:

"Section 1—That no bus terminal be located within the corporate limits of the City of Memphis without express approval of the planning commission of this city in accordance with the provision of Section No. 7 of Chapter No. 162 of the Private Acts of 1921 and the City Planning Ordinances.

"Section 2—That before the granting of any permit of use and occupancy, or any permit for building, remodeling, or repairing of any property as a bus terminal, plans showing the location of the terminal, the construction, remodeling or repairing of buildings, if any, the number of schedules to be operated, the location of repair shop, and the routing of buses into and out of such terminal, and the general plan of operation shall first be submitted to the city planning commission for its investigation and approval.

"That before it grants its approval of the location and structure of any bus terminal, the city planning commission shall refer all data in its possession, together with any comment, suggestion or report, which it desires to make, to the commissioner of fire and police:

"That upon receipt of any such data or report from the city planning commission, the commissioner of fire and police shall investigate the routing of such buses over the streets of the city and into and out of such bus terminal and make his report to the city planning commission:

"That upon the receipt of the report of the commissioner of fire and police, if said report approves the routing as submitted, or as modified, and if said plan, as submitted or as modified, meets with the approval of said city planning commission, said commission shall approve the issuance of permit or permits authorizing the location, operation or construction of such bus terminal:

"If the bus terminal location and plan, as originally submitted, or as modified, by the report of the commissioner of fire and police does not meet the approval of the city planning commission, or if the plan as submitted is not approved by the commissioner of fire and police, and such commissioner so reports to the city planning commission, the said planning commission shall then refuse its approval of the location and plan of said bus terminal and shall·certify its disapproval and the reasons therefor to the Board of Commissioners of the City of Memphis.

"Section 3—Be it further ordained by the Board of Commissioners of the City of Memphis that the regulation of routing of both passenger and motor-vehicle freight carriers over the streets and ways of the city and into and out of any terminals or depots is hereby

especially assigned to the department of the commissioner of fire and police and each and every person, firm or corporation operating such bus facilities into and over the streets of the City of Memphis shall submit the routing of his buses or motor-vehicle freight carriers to said commissioner for his approval, or disapproval;

"If the commissioner of fire and police approves of the routing of such buses and motor-vehicle freight carriers into and through the City of Memphis, he shall issue such permits authorizing said routing but if he disapproves of same, he shall offer such amendments to said routing as will make same meet with his approval, and. if said person, firm or corporation operating said buses or motor-vehicle freight carriers shall refuse to accept the modification of such routing, the commissioner of fire and police shall refuse his permit for such routing and certify his disapproval thereof, together with the reasons therefor to the Board of Commissioners of the City of Memphis. In granting or withholding his approval of the routing of passenger bus or motor-vehicle freight carriers into and through the City of Memphis, the commissioner of fire and police, subject to the laws of the State of Tennessee and the ordinances of the City of Memphis, so regulate such routings as to interfere as little as possible with the general traffice of the city."

Judge Patterson, in sustaining the motion for a directed verdict and in delivering his opinion, said in part as follows:

"If I was operating a bus line, I would want to know what the attitude of the city was towards my use of the streets with my buses where the terminal was situated, because I would want to know, as a matter of common sense, that I would have the use of the streets to come in and out. It would put the streets to a heavy use; it would be an additional burden upon the traffic, and I would want to know just exactly what the city's attitude was towards it. I think that was in the minds of the parties, as shown here by this contract.

"Now, I just don't see how this suit could be maintained, unless this was carried out. I think the effect of Mr. Lerner's testimony is that it was not obtained; that he recognized, as the attorney for Mr. Bauman, that it was necessary to do that, and therefore negotiations were entered into. He says that Mr. Davis and Mr. Jackson especially protested. That is the proof here in this case, and that is the proof by the plaintiff's witness. Now, you have got a stipulation in this contract here that is as plain as the nose on a man's face, which says that it had to be done. It was not done, and the lawsuit is brought, as I take it, without the contract being complied with by the plaintiff to that extent. Negotiations were then broken off, and no effort ever made to open them up again, and no effort made to get any further permit. And to show that there must have been something of this kind contemplated, in less than a year, or

within a year, an ordinance of the city regulating these things was passed. It had no more power then than it had before to do it. They just passed the ordinance under the police power, I take it, that the city from the State to regulate and control traffic on the public streets. There couldn't exist a municipality without the exercise of police power; especially with regard to the operation of bus lines; they are forms of public conveyances, like street cars. Buses have a right to use Main Street. They might not have the right to drive down Main Street, without authority from the city. I don't think a circus would have a right to parade on Main Street, without authority from the city. And I don't believe that a bus line would have a right to use a terminal in the central part of town, close to a church and under those circumstances, without permission of the city to do it. That is my view of the law in the case. I don't think there is anything to leave to the jury in the case, and I am going to instruct the jury to bring in a verdict for the defendant.''

The ascertainment of the expressed intention of the parties is the prime object of the interpretation of all written contracts. Conley v. Pacific Mutual Life Insurance Company, 8 Tenn. App., 405.

In construing a contract the courts will consider the object and intent of the parties, the nature of the subject matter, the relation of the parties to each other, and the objects to be accomplished. McKay v. Railroad, 133 Tenn., 590, 182 S. W., 874; Railroad v. Iron Co., 118 Tenn., 194, 101 S. W., 414; Nunnelly v. Warner Iron Co., 94 Tenn., 282, 29 S. W., 361.

It is the duty of the court to ascertain the surroundings and conditions, and to construe the contract for the purpose of carrying out the objects to be accomplished. Hardwick v. Can Co., 113 Tenn., 657, 88 S. W., 797; Southern Railroad v. Bacon, 128 Tenn., 169, 159 S. W., 602; Sullivan County v. Ruth & Co., 106 Tenn., 85, 59 S. W., 138; Railroad v. Iron Co., 118 Tenn., 194, 101 S. W., 414.

The circumstances and conditions of the parties are the best guides to construction. Southern Publishing Assn. v. Clements, 139 Tenn., 429, 201 S. W., 745; Neilson Canning Co. v. Lowe, 149 Tenn., 561, 260 S. W., 142.

This case was ably argued at the bar. We have been furnished with splendid briefs. It is plaintiff's insistence, through his able counsel, ''that the objects sought by the contract were attained by the plaintiff when he secured the permit from the city to use the premises described in the agreement for a bus terminal.''

It is further insisted that there was no law, city ordinance or otherwise which prohibited the defendant from using Third Street in the operation of its buses.

It is very evident from this record that at the time this agreement was entered into that the city authorities of Memphis had under con-

sideration the regulation of bus traffic within the city limits. The defendant did not want the bus terminal at 86-92 North Second Street unless it could have the right or privilege or permission to enter from Third Street. It wanted to load and unload its bus passengers in the rear of the bus terminal or station. The permit to use the space on North Second Street for a bus station gave the defendant the right of ingress and egress to the bus terminal from Second Street. The defendant wanted more than this right of ingress and egress from Second Street. It wanted its buses to approach the terminal from the rear towards Third Street.

It appears that there was an objection both to the bus terminal and to the way of approach by members of Calvary Church, which was adjacent to the proposed bus station. The defendant wanted to be assured that its use of Third Street would not be interferred with by the city authorities, who under the police power had the right to regulate bus traffic, and the complainant bound himself to secure this permission and the use of Third Street, which evidently the defendant was anxious to have. If the plaintiff did not think it necessary to secure this right for the defendant, then why was he employing an attorney, and who met often with the city commission, especially Commissioner Davis of the Police and Fire Department and Commissioner Jackson of the Street Department, who would not give their consent to the use of Third Street, and who really kept the matter postponed until definite action could be taken on the passage of the ordinance regulating bus traffic, from which we have heretofore quoted.

Taking the ordinary meaning of the language used in the contract before the court, and with a view to carry out the intention expressed by the parties as our polar star in construing the instrument and when we consider the object of the parties, the nature of the subject matter, the relation of the parties to each other and the objects to be accomplished, we are constrained to hold that the plaintiff agreed to do a certain thing, secure the permission to use Third Street, and this he failed to do, and having failed in this condition his suit must fail. There is no question made as to the plaintiff not having reasonable time to complete his negotiations, and the fact that an ordinance had not been passed at the time the defendant wrote the letter cancelling the agreement, does not, in our opinion, relieve the plaintiff. The city, evidently, had under consideration the ordinance that was passed April 1, 1930. Mr. Miller, the city clerk, who proved the passage of this ordinance, testified that he did not know how long it was under consideration before it passed. Plaintiff put in the agreement that a meeting of the city commission had been called to impose certain restrictions on the operation of bus lines in the

City of Memphis, so we infer that this very ordinance was being considered at the time of the execution of the agreement.

It results that the assignments of error are overruled and disallowed. The judgment of the lower court is affirmed. The plaintiff and his surety on appeal bond will pay the cost of the appeal. The cost in the lower court will be paid as ordered by the trial judge. Execution will issue accordingly.

Heiskell and Senter, JJ., concur.