The Louisville, New Albany and Chicago Railway Co. *v.* Godman *et al.*

## No. 11,696.

## THE LOUISVILLE, NEW ALBANY AND CHICAGO RAILWAY COMPANY *v.* GODMAN ET AL.

RAILROAD.—*Common Carrier.*—*Refusal to Receive and Carry Cattle.*—*Delivery for Transportation.*—Where cattle intended for shipment are placed in a railroad company's stock-pens at a station on its road, the refusal of such company afterwards to receive and carry such cattle, excuses any further delivery, or offer to deliver, for transportation, on the part of the shipper.

Same.—*Defective Stock-Pens and Loading Facilities.*—*Delay of Train Beyond Regular Time to Receive Freight.*—*Evidence.*—*Pleading.*—Evidence showing no wrong on the part of the railroad company except a failure to construct and keep in repair a proper fence around its stock-pens, and a failure to keep the chute in proper repair, whereby cattle intended for shipment escape from such pens, and their loading on the car was delayed until the train which was to carry them had left the station, will not support a recovery based on a complaint asking damages for a refusal to receive and carry such cattle; nor can a refusal to receive and carry be predicated upon the fact that the train was not held beyond its regular time until the cattle could be loaded.

Same.—The ways and means for loading being in proper condition, and the duty of loading being upon the shipper, it is his duty to have the car loaded so that the train which is to move it may not be unreasonably delayed.

From the Tippecanoe Superior Court.

*W. F. Stillwell*, for appellant.

*G. O. Behm, A. O. Behm, B. W. Langdon* and *T. F. Gaylord*, for appellees.

ZOLLARS, J.—The following is the only portion of appellees' complaint that needs to be here set out, viz.: "The plaintiffs complain of the defendant and say, that the defendant is a railroad corporation operating a line of railroad between Battle Ground City, in said county, and the city of Chicago, in the State of Illinois, and that at and before the time hereinafter named, said defendant held out to the general public, and caused to be known, that it was a common carrier of freight, stock and cattle, from said Battle Ground and other stations on the line of said railroad between said Bat-

tle Ground and said Chicago, and that said defendant had suitable and proper appliances to load and receive stock and cattle at said station; that relying on said representations of the defendant, the plaintiffs applied to the agent of the defendant at said Battle Ground, on the 10th or 11th day of August, 1882, to have shipped by the 16th day of August, 1882, from said Battle Ground to the union stock-yards in said Chicago, by said defendant, seventeen head of fat cattle, the property of the plaintiffs, for the purpose of making sale of said cattle, which purpose and object of the plaintiffs in so shipping said cattle was known at the time by said agent; that the said defendant then, on said 10th or 11th day of August, agreed to and with the plaintiffs to receive and ship said cattle on the 16th day of August, 1882, and that the cattle should be delivered in said union stock-yards at eight o'clock A. M., August 17th, 1882, in consideration of the payment by the plaintiffs to the defendant for the freight or carriage of the cattle the sum of twenty-five (25) dollars, payable on the delivery of said cattle at said yards in Chicago; that plaintiffs, relying upon the representations and promises of the defendant, delivered the cattle, at an expense of $100, according to the terms of said understanding, at the stock-yards of the defendant at Battle Ground, August 16th, 1882, in full time to ship said cattle. The plaintiffs say that the defendant, by reason of its failure to keep in repair and maintain means and ways to put the cattle on the cars (of which plaintiffs had no knowledge) of the defendant, after the cattle had been driven to Battle Ground and placed in the yards, refused to ship the cattle from Battle Ground station."

Following these averments are the further allegations that, by reason of such refusal, appellees were compelled to drive their cattle to another station on the line of appellant's road; that they were shipped from that station on the next day, and hence did not reach Chicago on the morning of the 17th of August. It is further averred, that the driving of the cattle to the second station necessitated the expenditure of

$25; that by reason of that drive they lost in weight, and that the delay in reaching Chicago resulted in loss, by reason of a declining market. For these several alleged losses, compensation is asked in the way of damages.

One of the errors assigned here is, that the court below erred in overruling appellant's demurrer to the complaint.

Appellees' theory is, that the gravamen of the action is the failure of the company to maintain and keep in repair proper ways and means for loading the cattle into the cars. If that theory should be adopted, we think the complaint would be insufficient. There is no charge that the railway company had not constructed such means and ways, nor that, as constructed, they were not proper and suitable. What is averred of them is more in the way of recital than of a positive averment of facts. But, regarding it as the averment of facts, it amounts to no more than that the ways and means for loading were out of repair. The word "maintain," used as a verb, does not mean to provide or construct, but, as defined by lexicographers, means to keep up, to keep from change, to preserve. Worcester's Dictionary. To hold or keep in any particular state or condition, to keep up. Webster's Dictionary.

In the case of *Moon* v. *Durden*, 2 Exchequer R. 21, it was said: " The verb ' to maintain,' in pleading, has a distinct technical signification. It signifies to support what has already been brought into existence."

The extent to which the ways and means for loading the cattle were out of repair is not stated in the complaint, nor is there any averment that they were so out of repair that the cattle might not have been loaded; and hence, as we have said, if the failure to keep in repair be regarded as the gravamen of the action, the complaint is insufficient, and the demurrer should have been sustained.

Regardless of any theory of counsel in the conduct of the trial and in the construction of the complaint, we must pass upon it as it comes before us. The proper construction of

the complaint is, that the railway company violated its contract and committed a wrong in refusing to receive and carry the cattle from Battle Ground. This is the gravamen of the action. Having thus refused, it is not material nor important what other wrong or neglect upon its part may have been the cause of the refusal; and hence what is averred in relation to the means and ways for loading the cattle, is not essential to the sufficiency of the complaint, nor is it important in determining the sufficiency thereof.

It is argued by counsel for appellant, that the complaint is bad, because there are no averments that appellees delivered, or offered to deliver, the cattle to appellant. The averments are not very specific, but we think they are sufficient to withstand the demurrer.

It is averred that the railway company "agreed * * to receive and ship said cattle"; that appellees "delivered said cattle, * * * according to the terms of said understanding, at the stock-yards of the defendant at Battle Ground," and that "the defendant, * * * after the cattle had been * * * placed in said yards, refused to ship said cattle from said Battle Ground station."

It is not averred in specific terms, that appellees delivered, or offered to deliver, the cattle to appellant, nor that appellant agreed to receive them at its stock-yards. The averments create a strong inference that such was the agreement, and that the cattle were so delivered, but inference, of course, can not take the place of, nor suffice for, allegations in pleadings. It is averred, however, that the cattle were placed in appellant's stock-yards at Battle Ground, and that after this was done appellant refused to "ship" them.

The word "ship," as here used, is not an appropriate word, but in the connection in which it is used it was meant to be, and under our liberal rules of pleading may be regarded as, the equivalent of to receive and carry.

The refusal, under the circumstances, we think, relieved appellees from the necessity of making any further delivery, or

offer to deliver, the cattle.   We hold, therefore, that the demurrer to the complaint was properly overruled.

It was assigned as causes for a new trial, that the verdict is not sustained by sufficient evidence, and is contrary to law.

It is well settled that the plaintiff must recover *secundum allegata et probata*, or not at all.   He can not declare upon one theory and recover upon another.   *Boardman* v. *Griffin*, 52 Ind. 101;  *Hays* v. *Carr*, 83 Ind. 275;  *Thomas* v. *Dale*, 86 Ind. 435;  *Lake Shore, etc., R. W. Co.* v. *Bennett*, 89 Ind. 457;  *Cleveland, etc., R. W. Co.* v. *Wynant*, 100 Ind. 160; *Brown* v. *Will*, 103 Ind. 71;  *Hasselman* v. *Carroll*, 102 Ind. 153.

The substance of the evidence in behalf of appellees is as follows:  Appellees having notified appellant's agent at Battle Ground, some days in advance, that they wished a car in which to ship their cattle to Chicago, the agent told them that the train would leave Battle Ground in the evening and get to Chicago at eight o'clock the next morning.   In compliance with appellees' request, a car was put upon the side-track opposite the chute leading from the cattle-pen.   After they had put their cattle in the pen at Battle Ground, appellant's agent at that place told them that they could not load their cattle, because the chute was broken down, and refused to assist them in repairing it.   Appellees, and another who was assisting them in the management of their cattle, fixed the chute by placing cord-wood under it.   They got it fixed, so that the cattle could be loaded, some two hours and more before the arrival of the train that was to take the car.   It was the custom of shippers at that station, including appellees, to car their own live-stock.   About two hours after the chute was fixed, appellees commenced loading their cattle.   When the train arrived fifteen head of the cattle were in the car.   The other two became frightened at the train, escaped from the cattle-pen and ran away.   They jumped over the fence of the cattle-pen at a place where a board was missing.   There was also evidence tending to show that the fence around the cat-

tle-pen was too low, although a new fence. Appellees sent two men after the escaped cattle, and also sent another to tell the agent to hold the train until they could be brought back and put into the car. Before this person returned, and before the escaped animals had been brought back, the train left, without taking the car into which appellees were loading their cattle.

It is shown by the testimony of appellees' witness, also, that the train waited from twenty to thirty minutes after the cattle escaped. There is no evidence that appellees requested that the car, with the fifteen cattle, should be forwarded by that train, nor that appellant's servants declined or refused to so forward it. On the other hand, it is apparent that appellees did not demand that it should be so forwarded, from the fact that their idea was to hold the train until the escaped cattle should also be in the car.

The testimony of appellant's witnesses is, that the train was held forty minutes in order that appellees might get their cattle loaded.

From this summary of the evidence, it is very plain that appellant did not refuse to receive and carry the cattle in the sense in which a refusal is alleged in the complaint; indeed, there is no evidence of any refusal, either to accept or to carry. The providing of the car and the holding of the train showed a willingness both to receive and carry the cattle. The evidence shows no wrong on the part of the railway company, unless it be a failure to construct and keep in repair a proper fence around the cattle-pen, and a failure to keep the chute in proper repair. We express no opinion as to the weight of the evidence upon these points, nor as to whether or not appellees suffered any loss by reason of the chute being out of repair.

It is sufficient to say that the case made by the evidence is not the case made in the complaint, and that for that reason the judgment must be reversed.

A refusal to receive and to carry the cattle can not be pred-

The Louisville, New Albany and Chicago Railway Co. *v.* Godman *et al.*

icated upon the fact that the train was not held for a longer time.  The ways and means for loading being in proper condition, and the duty of loading being upon the shipper, it is his duty to have the car loaded so that the train which is to move it may not be unreasonably delayed.  Trains are, and of necessity must be, run upon schedule time.  The transportation of freights, the security of the trains, and the safety of passengers require this.  *Frazier* v. *Kansas City, etc., R. W. Co.*, 48 Iowa, 571.  In that case it was said:  "A delay of a few minutes at one station might occasion a corresponding delay of every train on the line of road, and even result in accidents, destructive of property and life.  No person desiring to become a passenger upon a train could rightfully demand a delay of one minute to enable him to reach the train and get on board.  Upon what principle, then, can these plaintiffs demand damages because the defendant's train did not wait until they could drive their hogs into defendant's yards, load four cars, count them, have way-bill made out, shipping contracts signed, and the cars placed in the train?"

If appellant was guilty of any actionable wrong in relation to the cattle-pen and the chute, which occasioned loss to appellees without their fault, which we do not decide, that is the wrong for which it should respond in damages.  That, however, is not the wrong charged in the complaint.  The conclusion we have reached makes it unnecessary for us to consider other questions discussed by counsel.

The judgment is reversed, with costs, and the cause remanded, with instructions to the court below to sustain appellant's motion for a new trial, and to grant leave to appellees to amend their complaint if they so desire.

Filed Jan. 7, 1886.