# BLACKWELL *v.* OREGON SHORT LINE RY. CO.

### (161 Pac. 565.)

**Carriers—Delay in Transporting Livestock—Evidence.**

1.   Evidence in an action for delay in transporting livestock, *held* to sustain a finding that the cattle were ready to be loaded, in accordance with an arrangement with the carrier, at the time of the departure of the train. ·

**Carriers—Shipping of Livestock—Delivery to Carrier.**

2.   A shipper and the carrier may make such stipulations upon the matter of delivery to the carrier as they see fit, and when so made they are to govern.

**Carriers—Shipping of Livestock—Notice of Delivery to Carrier.**

3.   Where the station agent and conductor of a common carrier were informed the day before an intended shipment that the cattle were to be put into the pens for shipment according to custom, no further formal notice was necessary.

**Carriers—Shipping of Livestock—Acceptance of Shipment.**

4.   Where, in accordance with a recognized custom, a shipper notified the railroad company that he intended to ship a certain number of cattle next day, and had them ready to be loaded upon the arrival of the train, such acts, known to the carrier and not objected to, constituted a delivery and an acceptance of the shipment; no written receipt or bill of lading being necessary.

**Carriers—Shipping of Livestock—Liability.**

5.   The liability as common carrier begins with the actual delivery of the goods for transportation, and not merely with the formal execution of a receipt or .bill of lading.

**Carriers—Shipping of Livestock—Delay—Evidence.**

6.   In an action for damages for delay in transporting a shipment of livestock, evidence as to its market value at destination and of shrinkage per head *held* admissible; the value at the point of shipment and at destination being concededly the same except for the shrinkage.

**Carriers—Carriage of Livestock—Delay—Damages.**

7.   In an action for damages through delay in transporting a shipment of livestock, an instruction that the measure of damage would be the depreciation in the value of the animals caused by the negligent delay *held* proper.

**Carriers—Delay in Shipment—Actions—Parties.**

8.   Where the agent of a common carrier is joined as defendant in a suit for damages for delay in a shipment of livestock, but no cause of action is stated against him, and instructions are given as though

the carrier were the sole defendant, his name should be stricken from the judgment.

[As to liability of carriers of livestock for loss or injury, see note in 130 Am. St. Rep. 432.]

From Malheur: DALTON BIGGS, Judge.

In Banc.    Statement by MR. JUSTICE BEAN.

Plaintiff, N. Y. Blackwell, instituted this action against the Oregon Short Line Railway Company, a corporation, and Louis P. Delsole, for the recovery of damages alleged by him to have been sustained from the asserted delivery to the carrier at Juntura, Oregon, of 197 head of cattle at about 8 o'clock on the morning of September 16, 1915, and the carrier's failure to transport them from Juntura on the defendant's regular train, which it is averred left there after the stock had been delivered to the carrier. The allegation of the complaint in that respect is in substance that at about 8 o'clock A. M. on the above-named date the plaintiff delivered to the defendants, and they received and accepted from him, the said cattle to be by the defendant Oregon Short Line Railway Company transported from Juntura to Hope, in Malheur County, Oregon, within a reasonable time, which is from 2 to 5 hours. It is thereupon alleged that the carrier failed to transport the cattle within a reasonable time, but that they were held in the company's pens at Juntura until the following morning, when they went forward on the regular morning train, that by reason of such failure to carry and deliver said cattle and to care for them they were reduced in flesh, weakened and made unfit for market, to plaintiff's damage in the sum of $1,500.

The railway company denied that the cattle were delivered at 8 o'clock A. M. on September 16, 1915, or before the morning of September 17th, when 7 car-

loads of stock were received and transported from Juntura to Hope, Oregon. It also denied any damages. The cause was tried by the court and a jury, and a verdict found for the plaintiff. From a following judgment for $933.44, the defendants appealed.

A brief outline of the case, which the evidence tended to prove, is as follows. The plaintiff is a dealer in livestock, and has followed that business for several years, shipping both to eastern and coast markets. During the season of 1915 he was engaged for a part of the time in shipping cattle out of Juntura, Oregon, over the road of the defendant Oregon Short Line Railway Company. Prior to the shipment complained of he had made one or two similar shipments, and had ordered cars for the transportation of the cattle in question, which cars the company had ready at Juntura. The plaintiff was buying these cattle by weight, the drovers bringing them in, holding them outside the yards one night, and weighing them the next morning. On the day prior to that on which plaintiff alleges he made delivery, plaintiff informed Delsole, the agent for the railway company at Juntura, that he would be ready on the following morning to ship 7 cars of cattle on the regular train. Plaintiff was instructed by Delsole to have his cattle at the yards at about 8 o'clock A. M., as the train would be in about that time. Following these instructions the plaintiff secured the assistance of several parties and had the cattle in the stockyards when the train backed up to load. Another shipper, William Jones, had 2 cars of cattle in the yards when the plaintiff arrived with his cattle, having put them in the night before, and they were then in the loading chutes. When the train came in plaintiff had his cattle close to the corral and before it backed up to the stockyard to load Jones' cattle, he

had his in the pens. Before placing them there he cut out a portion of 37 head of feeders that did not have to be weighed, putting them in a separate pen preparatory to loading. Upon getting the cattle into the pens he and part of his men proceeded with dispatch to weigh the remaining 160 head, which were beef cattle. Some considerable time after the train backed down to the stockyards the railroad men and Mr. Jones proceeded to load his 2 cars. The conductor stated that when this was accomplished he asked plaintiff when he would be ready to load, and was told that it would take some time. This, however, is denied by the plaintiff. The conductor states that afterward he made the same inquiry of a man who was helping to cut out the cattle, and he was told that it would be 2 or 3 hours. The evidence tended to show further that thereupon the conductor took his engine and proceeded to the station; that he returned in a short time, picked up the 2 cars of Mr. Jones' cattle, and, without further investigation as to whether or not the plaintiff was ready to load, placed the 2 cars of Jones' stock in the train, and before plaintiff was aware of it left the station at about 9 A. M. At this time there were about 3 cars of plaintiff's cattle ready to load, consisting of 1½ or 2 cars of beef cattle, and the 37 head of feeders, and a sufficient number of men on hand to attend to the loading. Plaintiff finished weighing the cattle at 9:30 or 9:35 A. M. Upon ascertaining that the train had departed, he immediately telegraphed to an officer of the defendant corporation, stating that his stock had been left in the yards, and requested "power" with which to move them, also stating that unless defendant could furnish equipment, the cattle were at the disposal of the company. He waited all day for an

answer, making inquiries of the agent regarding the same but receiving none. The service on this branch railroad consists of one train a day each way, a mixed train carrying passengers, freight, baggage, mail, express and such livestock as there is for shipment at the various stations along the line. It was the custom of the defendant company to wait upon shipments until all the livestock tendered for shipment at the various stations along the line could be loaded, waiting in some instances several hours. Sometimes the train was delayed until the afternoon before departing from Juntura. Defendant's agent stated that in the neighborhood of 1,000 cars of livestock were shipped over this branch during the shipping season of 1915, and that this tonnage was handled by this single train, except in a few instances, when special ones were run. Plaintiff's cattle were in the yards without feed for more than 24 hours, and upon arrival of defendant's train on the following morning, September 17th, were loaded in 25 minutes and shipped out at about 9:30 o'clock A. M. The shrinkage was about 100 pounds to the head, and the value of the cattle at Juntura was 5.75 or 6 cents a pound. It appears from the evidence that the damage caused by the failure to ship the cattle within a reasonable time was from $5 to $10 a head, and that while the cattle were in the yard waiting the railway company furnished them water, but no feed.

On behalf of the defendant company, Mr. Delsole testified that Blackwell had shipped cattle on the 15th of that month, and that the train was held 2 hours; that on that day he informed Blackwell that he would have to have his cattle in the next morning at about 8 o'clock; that he did not get them in by that time nor by the time the train arrived; that when the train

came back to the station after the cars containing Jones' cattle were attached, he told the dispatcher it would be 1½ or 2 hours before Blackwell would be ready to load. The dispatcher answered instructing them that the train should not wait. He said that they never left stock when they were ready to be loaded.                              AFFIRMED.

For appellants there was a brief over the names of *Mr. H. B. Thompson, Mr. George H. Smith* and *Mr. William E. Lees,* with an oral argument by *Mr. Thompson.*

For respondent there was a brief with an oral argument by *Mr. P. J. Gallagher.*

Mr. Justice Bean delivered the opinion of the court.

1. It is candidly stated in defendants' brief as follows:

"The basic question, therefore, so far as the railroad company is concerned, was whether the plaintiff delivered and the defendant received the cattle at about 8 o'clock on the morning of the day in question and before the departure of the morning train, * * and if the cattle were delivered before the departure of that train it was the duty of the carrier to take them out then, that being the only scheduled train on the branch as provided by the published and filed schedule."

It will be seen that there was a sharp conflict in the evidence as to the preparedness for the shipment of the cattle in question at the time of the departure of the train. The testimony on the part of the plaintiff tended to show, and the jury found, that when the train arrived at Juntura the cattle were near by the stockyard of the defendant where the men were cutting out the feeders as it was a better place for such

work than in the yards; that they were in the yard when the train backed up to load the Jones cattle; and that when the latter were loaded and out of the way, Blackwell had about 3 cars of his cattle ready to load, and, except for some misunderstanding caused probably on account of strained diplomatic relations between Blackwell and the defendant's servants, would have commenced to load the cattle into the cars while other men weighed the remainder, so that there would have been but a few of the cattle left to load when the weighing was completed at about 9:30 o'clock, and the train would not have been delayed on account of loading the Blackwell cattle any appreciably longer time on that day than it was on the following day when they were loaded in 25 minutes. It appears that Juntura is a small station on this branch line, and that the railway company did not maintain a yard, nor provide any means for placing the cars for loading cattle until the regular daily train arrived, and did not expect the stock to be loaded in advance of its arrival. There were 7 carloads of plaintiff's animals, and they could not all be loaded at once. The loading chute held but one car, and if they were loaded and transported at all, under the prevailing conditions, the daily train must be held to afford a sufficient length of time for so doing. The jury found according to the theory of the plaintiff, and this must be assumed to be the true one. It was not the theory of the defendant, as indicated by the evidence, that it would have disarranged the train schedule and prevented the regular connection for the railroad men to have devoted 35 or 40 minutes to the loading of plaintiff's cattle on the 16th, but that it would be 1½ or 2 hours before Blackwell would be ready to commence loading. The jury did not find the condition as

claimed by the servants of defendant to exist.   It could fairly find from the evidence that when defendant's train left Juntura plaintiff's cattle were, for all practical purposes, ready to be loaded upon the cars; that plaintiff had made arrangements with defendant through its agent to have the cattle there at about 8 A. M. on that morning; and that he complied with the requirements of the railway company in this respect.

The conditions on the branch line of the defendant railway are different from those upon which the opinion was based in *Cohen* v. *Minneapolis, St. P. & S. S. M. Ry. Co.,* 162 Wis. 73 (155 N. W. 945), cited by defendants, where plaintiff requested a fast stock train to wait for livestock which was not loaded into the cars but which should have been loaded before the train arrived.

2. It is deduced from the general rules in 4 R. C. L., Section 409, page 951, that a common carrier is bound to accept and carry livestock that is tendered to it for shipment in good condition.   As to the delivery for shipment we find in the notes to *Norfolk & W. R. Co.* v. *Harman & Crockett,* 91 Va. 601 (22 S. E. 490, 50 Am. St. Rep. 85, 44 L. R. A. 290, 292), the following rules:

"The duty of a carrier of livestock to receive, transport, and deliver it is not fully discharged unless the carrier makes provision at the place of loading to properly receive and load the stock, and provision at the place of unloading to properly deliver the stock to the consignee: *Covington Stockyards Co.* v. *Keith,* 139 U. S. 128 (35 L. Ed. 73, 11 Sup. Ct. Rep. 469)."

"And the refusal of a railroad company to ship cattle from a station after they had been delivered according to the terms of the contract of shipment at stockyards of the company at that station and placed in such stockyards relieves the shipper from the neces-

sity of making any further delivery or offer to deliver: *Louisville N. A. & C. R. Co.* v. *Godman,* 104 Ind. 490 (4 N. E. 163)."

In the present case the general rule is subject to the conventional arrangements made between Blackwell and the agent of the railway company on the previous day, to the effect that plaintiff should have his cattle there at the stockyard at Juntura ready to load at about 8 A. M. on September 16, 1915, when the train came in and was ready to receive them: *Lackland* v. *Chicago & A. R. Co.,* 101 Mo. App. 420 (74 S. W. 505). What actions of the shipper will constitute delivery to a carrier are necessarily governed by the surrounding circumstances of each case. Such conventional arrangements may be varied by usage or by a particular course of dealing between the parties. They may make such stipulations upon the matter of delivery as they see fit, and when made they are to govern: 4 R. C. L., p. 690, § 168.

3. The station agent and conductor of defendant were informed on the day before the intended shipment that the plaintiff's cattle were to be put into the pens for shipment, and no further formal notice was necessary: 1 Hutchinson, Carriers (3 ed.), § 115; *Mason* v. *Missouri Pac. Ry. Co.,* 25 Mo. App. 473; *Nelson* v. *Chicago, B. & Q. R. Co.,* 78 Neb. 57 (110 N. W. 741).

4. A delivery of cattle to a carrier may be either actual or constructive, and when made in accordance with the recognized custom and practice prevailing in the dealings between shippers of livestock and the railway company it will bind the carrier and constitute an acceptance, and when the facts are in dispute the question of delivery is for the jury: 4 R. C. L., p. 692, § 170; 4 Elliott, Railroads, § 1413; *Deming* v. *Merchants' Cotton-Press & S. Co.,* 90 Tenn. 306 (17 S. W.

89, 13 L. R. A. 518). But no formal acceptance is necessary where the agent has knowledge of the delivery of the goods with the intention that they be shipped and makes no objection thereto. It is not essential that there be any written receipt or bill of lading.

5. The liability of the carrier as common carrier begins with the actual delivery of the goods for transportation, and not merely with the formal execution of a receipt or bill of lading: 6 Cyc. 413. The trial court properly overruled defendant's motion for a nonsuit and request for a directed verdict in its favor.

The court charged the jury practically in conformity with the law as above stated. Instruction No. 9, excepted to by defendant, is as follows:

"If you find that plaintiff brought his cattle to the stockyards of the defendant railroad company for transportation on the train from Juntura to Hope in accordance with the directions of its agent, or in accordance with its recognized custom of receiving cattle for transportation, then this would constitute a sufficient delivery to compel the defendant to transport them within a reasonable time."

6. It is contended on the part of the defendant that the court erred in receiving evidence concerning the market value of the cattle at Hope, Oregon, on September 17, 1915, in the condition in which they were delivered and of the shrinkage per head between the time they were delivered to the railroad company at Juntura and when they reached Hope on the following day. The measure of damages was based upon the loss in the weight and value of the cattle caused by the delay in the shipment from Juntura and delivery at Hope. Both places are in the same county about 40 miles apart, which is a stock-raising district, a place of purchasing and not a selling market for beef cattle, as the

term is usually understood. It appears that upon the trial of the cause the value, whether at Juntura or at Hope, was assumed by the attorneys and witnesses to be the same, except for the shrinkage caused by the unnecessary delay in shipping and delivery. The question as to the usual and ordinary loss of weight in the shipment for such a distance was all detailed and explained to the jury. It could not be ascertained exactly. The jury was in a position to and undoubtedly did determine the amount of deterioration in the value of the cattle which was the usual and natural consequence of a failure to carry and deliver them within a reasonable time, and which would be regarded as reasonably within the contemplation of the parties to the contract when the same was made: *Levy* v. *Nevada-California-Oregon Ry. Co.,* 81 Or. 673 (160 Pac. 808); *Howell* v. *St. Louis & Hannibal Ry. Co.,* 171 Mo. App. 92 (153 S. W. 578).

7. The court charged the jury to the effect that if they found for plaintiff, the measure of damages would be the depreciation in the value of the animals caused by the negligent delay in the shipment: 4 R. C. L., p. 998, § 466. We find no variance from the rule as to damages, either in the admission of evidence or instructions to the jury, which would change the result or constitute reversible error.

8. The agent, Delsole, was named as defendant in the action. No cause of action against him was stated in the complaint, and no attention seems to have been given him upon the trial. The lower court instructed the jury as though the railway company was the only defendant. Delsole's name should be stricken from the judgment.

Finding no prejudicial error in the record, the judgment against the defendant Oregon Short Line Railway Company is affirmed.    AFFIRMED.