Argued September 17, reversed and remanded October 14, 1959

# BROWN *v.* BONESTEELE

344 P. 2d 928

314

*Asa L. Lewelling,* Salem, argued the cause for appellant. On the brief were Lewelling & Gies, Salem.

*Otto R. Skopil,* Salem, argued the cause for respondent. On the brief were Williams & Skopil, Salem.

Before McAllister, Chief Justice, and Warner, Sloan, O'Connell and King, Justices.

O'CONNELL, J.

This is an action for damages brought by a shipper against a carrier to recover for the loss by fire of a truck load of twine while being transported in defendant's truck. The origin of the fire was not established although it is probable that it resulted from placing the twine too close to the exhaust pipe which was exposed in the interior of the truck. Werner Brown holds all but two shares of the stock of plaintiff corporation. We shall refer to him as the plaintiff.

The complaint is drawn on the theory that the defendant had possession of the goods as a common

carrier and was, therefore, absolutely liable for their loss. The defendant denies that he was acting as a common carrier in this instance, although the truck which was used was under a common carrier permit issued by the Public Utilities Commissioner of Oregon. He further contends that the loading of the truck was done under the direction and control of plaintiff's servants and that the loss was due to their negligence. As a separate defense it is alleged that the truck was rented to the plaintiff and that it was under the plaintiff's control in the course of loading and hauling the goods in question.

The case was submitted to the jury which found for the defendant. Several assignments of error are relied upon, the principal one being that the trial court should have directed a verdict for the plaintiff on the ground that the evidence clearly established the status of the defendant as a common carrier and there were no other questions of fact requiring the jury's deliberations.

The defendant's principal business is the storage of goods. However, he is also engaged in the business of transporting goods for others, which he does under a permit from the Public Utilities Commissioner authorizing him to haul goods as a common carrier within the city of Salem and not to exceed 25 miles outside of Salem. He filed two tariff schedules with the commissioner, one establishing an hourly rate of six dollars for cartage within the city of Salem, and a hundredweight rate for hauls outside the city.

■ The principal question before us is whether there is any substantial evidence to submit to a jury showing that defendant had changed his status in this particular instance from that of common carrier to that of a lessor of a truck or as a carrier contracting to haul goods

under a special contract of carriage. As a common carrier defendant would be liable as an insurer for the loss of plaintiff's goods. *Lacey v. Oregon R. & N. Co.*, 63 Or 596, 128 P 999 (1913); Brown, Personal Property (2d ed 1955), p 416. As a contract carrier or lessor he would be liable only if the loss resulted from his fault. A common carrier is defined in ORS 767.005 (5) as follows:

> " 'Common carrier' means any person who transports for hire or who holds himself out to the public as willing to transport for hire, compensation or consideration by motor vehicle, persons or property, or both, for those who may choose to employ him."

A contract carrier is defined in ORS 767.010 (1):

> " 'Contract carrier' means any person engaged in the transportation by motor vehicle of persons or property, or both, for compensation, under special and individual agreements, leases or other arrangements, and not included in the term 'common carrier.' "

As a part of his business plaintiff sells twine to various canneries in the Salem area. The canneries distribute the twine to farmers engaged in the production of string beans. The twine, packed in cartons, is shipped to Salem by railroad. The plaintiff then distributes the twine to his customers by truck.

On March 18, 1955 plaintiff, upon learning that a carload of twine was on its way to Salem, got in touch with defendant to make arrangements for the hauling of the twine to various canneries. There is a conflict of testimony as to what was said in this conversation. Plaintiff testified as follows:

> "Well, as the jury probably knows by now, Mr. Bonesteele hauled twine for me the year previous to United Growers and Stayton Cannery, and hauled

twine for Shuford Brothers to Cal Pack, and that day he sent out one truck. I don't know if it was one driver and an assistant, but he took a long time to get it unloaded at Cal Pack and we had a crew at Paulus Brothers, and I said, 'Wally, what can we do? We have the same situation coming up, a car load of twine.' I think I gave him the exact day or approximate date, and he said, 'I think I can let you have two trucks.' He said, 'I will give you the'—I can't think of the name of the small truck we had before—it isn't a panel, but he said, 'It will be adequate for delivering the twine to United and Blue Lake and you can assemble the rest and Paulus Brothers take theirs—assemble the rest for Stayton.' And I said, 'Fine.' Finally he said, 'I charged you for a truck and a man at an hourly rate.' He said, 'I think it will be to your advantage to duplicate that, in town always on that rate and out of town on a mileage basis.' I said, 'Well, that is satisfactory with me.' And I also intimated I didn't have to pay the freight, so whatever was right was fine with me, so we left it on that high note, or that low note."

Plaintiff testified that he informed defendant of the weight and destination of the twine.

"He [defendant] said how much does it involve and so forth, and I said, 'We have 21,000 pounds going to Stayton; we have 5,000 pounds to Blue Lake; and roughly 4,800 pounds to United Growers,' which helped him in making the arrangements. He said, 'The small truck can haul this here in town and the big truck will haul the other.' "

With respect to the arrangements for payment, plaintiff testified as follows:

"* * * I told Mr. Bonesteele—I said, 'Last year you invoiced me for this hauling.' And I said, 'That is all right, I pay you and the people I pay for the twine give me credit.' And I said, 'This year I want you to bill them.' I said, 'Bill Shermerhorn Brothers.' And he said, 'What is their address?'

And I didn't know the address but I told him to call Maria, my secretary, and she will give you their address. He said, 'Fine.'

"Q. To your knowledge, have you or any other person received any invoice on this load?

"A. No, sir."

The defendant's testimony relating to the agreement to transport the twine was as follows:

"Mr. Brown came to the warehouse to make arrangements for this and I asked him—he mentioned the material was coming by rail car, and I asked him if he wouldn't rather put the car down by the warehouse and give us the documents and since we had the equipment and everything we would handle the transaction in proper fashion, and he said, no, he would not, that he wanted the car docked at Paulus Brothers. I, in turn, asked him, 'Would you like me on the job to supervise the loading of the material?' and he said, 'No, I will take care of the supervising of the loading.'"

* * * * *

"I was advised that Mr. Brown wanted to have the same he had before; he was going to make the same type of movements of the merchandise he had made the previous year, which was almost exactly a year before, at which time some twine had been moved to Stayton. I was not notified how much was to go to Stayton, or I wasn't advised what the quantity of twine involved would be.

* * * * *

"There was nothing absolutely discussed in concrete evidence about where the twine was to go and nothing concrete in terms of charges other than the fact he called and asked me if we would handle some twine—give him a truck and equipment to handle twine as we had done previously one year.

* * * * *

"Actually in the second conversation was when the particulars were discussed.

* * * * *

"I believe at the time, the second time Mr. Brown

talked to me he told me that on such a day—I believe it was Friday—we were to have two trucks and two men at Paulus Brothers cannery at 8 o'clock in the morning."

The bill for the 1954 hauling job was submitted after the job had been completed, the invoice indicating that the charge was for three men and a truck for eight hours. The defendant testified that the 1954 charge was based upon an hourly rate of five dollars and that the charge for the 1955 job was six dollars, although no bill was sent for the latter job. No bill of lading was issued for either the 1954 or the 1955 hauls.

The defendant contends that the plaintiff's conduct in supervising and controlling the loading operation is further proof that the defendant never assumed the status of a common carrier. The railroad car containing the twine was spotted at the siding serving the Paulus warehouse rather than at the defendant's siding. During the course of the unloading plaintiff was inside of the box car checking off the serial number of each carton as it was removed from the car. The loading of the defendant's truck was done under the immediate direction of the defendant's regularly employed truck driver. He decided where the cartons were to be placed in the truck as they were brought to the truck bed by others. When the entire cargo was loaded he leveled the load off and tied it down. Plaintiff was not present at the truck during the loading operations. When he had finished checking the cartons in the box car he left. The truck had not been completely loaded at that time. At one point in the loading operation the truck driver went into the box car and discussed something with Brown. Claude Martin, the foreman in charge of the Paulus employees, who was employed to assist in the unloading operation testified that the driver made

inquiry of the plaintiff as to the number of cartons remaining to be loaded. Martin understood that the inquiry was made by the driver to determine whether he could take the entire cargo in one load. Thereafter the driver left for a short while. Martin surmised it was to use the telephone but there was no evidence to support the conjecture and the driver denied that he made a telephone call at the Paulus warehouse. The driver testified that in his conversation with plaintiff he "tried to find out how big a load and how much I was to take." He also testified that the plaintiff directed him to park the truck so that it could be loaded by lift truck, and when loaded where to deliver the cargo. The driver was paid by defendant, the Paulus employees were paid by plaintiff who was eventually to be reimbursed by the shippers.

■ The foregoing is a fair summary of the principal evidence relevant to defendant's status in the transaction with plaintiff. It is undisputed that the defendant held himself out to the public as a common carrier. That being so, it would devolve upon him to establish that the transaction with plaintiff was not in the regular course of his ostensible calling.

> "* * * The presumption undoubtedly is, that one who, in the exercise of his public vocation, undertakes to transport a thing, does so subject to the common-law liabilities; and this presumption prevails until overcome by countervailing proof of a special agreement as to the terms of carriage." Schouler, Bailments Including Carriers, § 382, p 226. See also § 384.

■ It is not for us to weigh the evidence except to determine whether defendant has put enough in the scale to get to the jury. In making that judgment we are entitled to consider the fact that defendant did

not comply with the regulations promulgated by the Public Utility Commissioner pursuant to statute. Under those regulations a permittee who wishes to lease a vehicle operating under a permit must pay a fee, and obtain the necessary evidence of authorization from the commission. This was not done in the present case. The fact that the régulation and statutes were violated does not, in itself, preclude a finding that a permittee changed from a common carrier to some other status in the particular instance. However, there is a strong presumption that one does not violate the law, and that presumption can be taken into account by us in interpreting the transaction in question for the purpose of determining whether the case should go to the jury.

What evidence was presented to show that defendant temporarily changed his common carrier status? The conversations between the parties prior to the arrival of the railroad car contained nothing of substance to establish a lease of the vehicle for this one transaction. The general language concerning destination, weight of cargo, the rate to be charged, the location of the railroad car for loading purposes, plaintiff's agreement to supervise the loading, and the absence of a bill of lading are relied upon by defendant as evidence of a lease transaction. But it is not uncommon for shippers to order trucking services without specifying the details of rate, weight of cargo and the like, or without demanding a bill of lading. The failure to designate the destination is of little importance in the present case because defendant knew the nature of the haul, and the specific destination was of little consequence.

■ It has been held that where the owner of a vehicle rents it, together with a driver, for a temporary purpose the right of the hirer to prescribe cargo, desti-

nation and route does not constitute sufficient control over the driver to make him the hirer's servant. *Densby v. Bartlett,* 318 Ill 616, 149 NE 591, 42 ALR 1406 (1925); *Turner v. Schumacher Motor Express, Inc.,* 230 Minn 172, 41 NW2d 182 (1950); *Antonelly v. Adam,* 175 Minn 438, 221 NW 716 (1928). Other cases illustrating this principle will be dealt with below. The owner's surrender of control over his vehicle and driver has significance in determining liability only as such giving up of control has relevance in explaining why the owner or hirer should bear the loss. The hirer's privilege to designate the destination of the goods would be relevant in determining his liability were he to choose a dangerout route to suit his needs. Likewise, if a hirer has been given the privilege to control the specific manner of loading and if, in preparing the load, he creates a risk which results in the loss of the load there is reason for shifting the burden of loss to him.

But there is no substantial evidence of any connection between right to control and risk in the present case. The plaintiff's reservation of the right to spot the railroad car at the Paulus siding rather than at defendant's warehouse siding is not relevant to the risk which created the loss here. Likewise, plaintiff's supervision over the unloading is not relevant. There is no evidence that defendant surrendered to plaintiff the right to designate the manner in which the cartons were to be placed on the truck and there is no evidence that plaintiff actually exercised control over the loading in this respect. There is, therefore, no relationship between the control reserved and exercised by plaintiff and the cause of the loss to the load. The necessity of establishing a connection between the right to control and the specific act causing the harm when one's

servant is loaned to another is explained in 1 Restatement, Agency 501, § 227, comment a:

> "* * * Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act. This is a question of fact in each case."

■ The defendant argues in effect that the driver in the present case became a loaned servant of plaintiff, but the evidence does not support the argument. The truck driver was paid by defendant for the work he performed on the day in question. He reported back to defendant, not to plaintiff when the fire destroyed the load. There was no evidence to rebut the inference that a servant remains in his general employment when performing services for another. 1 Restatement, Agency 501, § 227, comment b.

The comment in 1 Restatement, Agency 502, § 227, comment c is in point:

> "A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality and these may be

divergent from the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality. A person who is not in such business and who, gratuitously or not, as a matter not within his general business enterprise permits his servant and instrumentality to assist another, is more apt to intend to surrender control."

Support for the position that the plaintiff did not become a private carrier can be found in the cases dealing with interstate regulation of motor carriers. The Interstate Commerce Commission and the federal courts have been called upon to determine whether the leasing of equipment by a carrier to a shipper results in removing the carrier from the status of a common or contract carrier in interstate commerce. Although the question in such cases is not in all respects the same as that before us, the commission's and courts' treatment of the problem of control is relevant to our inquiry. An illustrative case is *John J. Casale, Inc., Contract Carrier Application, No. MC 20314* reported in 4 Fed Carr Cas 356, par. 30,861. There the applicant for a permit was found to have engaged in the practice of leasing equipment to shippers. Applicant contended that it was not engaged in the carriage of goods under the lease arrangements and that such portion of its business was not subject to regulation by the commission. The commission held that the applicant continued to be a carrier (a contract carrier in this instance) and the shipper, in using the leased equipment, was not

engaged in private carriage. The opinion contains the following language:

"Although applicant's testimony is to the effect that the driver of each vehicle is under the complete direction of the shipper to which the vehicle is assigned, such 'direction' appears to be limited to the loading and dispatching of the vehicle, instructions pertaining to deliveries, and the time at which a trip should be made. Such practices are natural concomitants of any motor-carrier operation under which specified units of equipment are devoted exclusively to the needs of a particular shipper and do not necessarily imply direction and control by the shipper. The drivers paid by applicant may only be discharged by it, although the shipper may request that a driver be discharged for misconduct and the like. * * * It is clear that applicant, through its driver-employees, retains control of the actual movement of the vehicles. Moreover, applicant assumes responsibility to the public for the operation of such vehicles.

\* \* \* \* \*

"* * * For all essential purposes these trucks and drivers have been under applicant's direction and control and the transportation service rendered by them clearly has been provided by applicant. The fact that the shippers have instructed the drivers as to where to pick up and deliver the traffic and as to other minor shipping matters is of no significance. Such instructions by shippers are incidental to any motor carrier service, both common and contract, and plainly do not constitute such control and direction over the trucks and drivers as to make the operations their own. In the circumstances we conclude that applicant when operating in the manner described has been and is conducting operations as a for-hire carrier." 4 Fed Carr Cas at p. 360, 361, 362.

*Accord: Interstate Commerce Commission v. Isner,* 92

F Supp 582 (DC Mich 1950); *Interstate Commerce Commission v. F & F Truck Leasing Co.*, 78 F Supp 13 (DC Minn 1948); *U. S. v. LaTuff Transfer Service, Inc.*, 95 F Supp 375 (DC Minn 1950). For cases involving state regulation see *Entremont v. Whitsell*, 13 Cal2d 290, 89 P2d 392 (1939); Re Frank Ferens, 58 PUR NS 525 (1945).

These cases support the plaintiff's contention that it was not a private carrier using leased equipment. The conclusion in these cases that the carrier was a contract carrier does not weaken plaintiff's position in the present case that defendant continued to be a common carrier in his relation to plaintiff. In the cases cited the equipment was used under definite leasing arrangements clearly establishing a special contract of carriage; in the instant case there was no substantial evidence to establish a special contract negativing the status of a common carrier.

As we have already stated, the defendant has the burden to prove that he changed from a common carrier to some other status. That burden is properly described in the case of *John J. Casale, Inc.*, supra, where the court said:

"* * * in order for applicant to overcome the presumption that it is a carrier as to the operations performed by vehicles leased by it to shippers, accompanied by its drivers, it must be clearly shown that the lessees of applicant's vehicles operate such vehicles as private carriers. In order for such a lessee to be found to be a private carrier, however, there must be a clear and unequivocal showing that it exercises control and responsibility over the operation such as would be exercised by it if it were the owner of the vehicle." 4 Fed Carr Cas at p. 359.

In *Interstate Commerce Commission v. F & F Truck*

*Leasing Co.,* supra, the court described the carrier's burden of proof as follows:

"In order for the operations to be those of the shipper as a private carrier there must be a clear and unequivocal showing that the shipper exercises control and responsibility over the operations of the vehicle, such as would be exercised by it if it were the owner of the vehicle." 6 Fed Carr Cas at p. 2579.

To the same effect is *The New Jersey Steam Navigation Co. v. The Merchants' Bank,* 6 Howard 344, 12 L ed 465 (1848) which will be discussed below. The cases involving the attempt of a carrier to limit its liability by agreement uniformly hold that the burden is on the carrier to prove the limitation. *Hill v. Adams Express Co.,* 82 NJL 373, 81 A 859 (1911); *Lacey v. Oregon R. & N. Co.,* 63 Or 596, 128 P 999 (1913); *McGregor v. Oregon R. & N. Co.,* 50 Or 527, 93 P 465 (1908). We shall make further reference to defendant's burden of proof later in this opinion.

Defendant attached significance to the fact that plaintiff did not demand and did not receive a bill of lading. Apparently, it is defendant's theory that since common carriers are required to issue bills of lading the fact that defendant did not issue one in the present case is evidence that the parties did not intend that he serve as a common carrier. Bills of lading frequently are not issued by carriers until after the completion of the job. For example, see *McGregor v. Oregon R. & N. Co.,* supra. In the circumstances of this case, where the parties were acquainted with each other, had previously arranged for a similar movement of goods, and where the hauling job would be completed in one trip, we do not regard as significant the failure of the defendant to issue a bill of lading to the plaintiff. Certainly a common carrier cannot change its status,

with the concomitant liability as insurer, simply by violating its obligation to issue a bill of lading. A bill of lading is not necessary to subject the carrier to liability as insurer of the goods. 1 Hutchinson on Carriers, (3d ed 1906), p 160. As stated in *Blackwell v. Oregon Short Line Ry. Co.,* 82 Or 303, 161 P 565 (1916) :

> "The liability of the carrier * * * begins with the actual delivery of the goods for transportation, and not merely with the formal execution of a receipt or bill of lading." 82 Or at p. 312.

To the same effect see *Alabama Midlands Ry. Co. v. Darby,* 119 Ala 531, 24 So 713 (1898) ; *Meloche v. Chicago, M. & St. P. Ry. Co.,* 116 Mich 69, 74 NW 301 (1898) ; *Missouri, K. & T. Ry. Co. of Texas v. Beard,* 34 Tex Civ App 188, 78 SW 253 (1904) ; *Martin v. Ft. Worth & D. C. Ry. Co.,* 3 Tex Civ App 556, 22 SW 1007 (1893) ; *Texas P. Ry. Co. v. Nicholson,* 61 Tex 491 (1884). Under the circumstances present in this case we do not regard the failure to issue a bill of lading as having any weight in determining the defendant's status.

As further evidence that there was a special contract between the parties, defendant points to the fact that the rate charged in the present case was different from that called for under the tariff of rates filed by him with the Public Utilities Commissioner. As we have already indicated, the filed tariff permitted defendant to charge an hourly rate of six dollars for cartage within the city of Salem and a rate on the basis of hundredweight for trips outside the city. The rate charged in the present case was six dollars an hour. This would conform to the intracity tariff but not the tariff for the haul to Stayton which was the destination of the load involved in this case. The defendant tesitfied that the cost of hauling plaintiff's goods under

the tariff would have been $95 to $100, whereas at the hourly rate the cost was between $35 to $40. It does not appear whether this difference between the two charges would be the same if plaintiff had not assisted in the unloading operation.

The answer to defendant's contention is found in *Shikany v. Salt Creek Transp. Co.,* 48 Wyo 190, 45 P2d 645 (1935), a case very similar to the case at bar. There the plaintiff shipper brought an action against the defendant carrier to recover the sum of $2,500, the value of an oriental rug delivered to the defendant, for transportation between two cities in Wyoming. The carrier claimed that it did not act as a common carrier in the particular transaction. It pleaded that:

> "* * * 'a separate, special and specific contract was entered into between plaintiff and defendant * * *; that pursuant to said special contract a lump sum was agreed upon between the parties for the carriage of said goods, but that defendant did not undertake or agree to transport and deliver said household goods as a common carrier for hire.' * * * 'that the agreed price for said transportation of said goods was the sum of $15.00, and which was, and is a sum of money much less than the authorized and existing rate properly chargeable for the transportation of household goods by motor vehicle common carriers in the State of Wyoming.' " 45 P2d at 646.

The court said:

> "* * * It cannot be disputed that, whatever else the defendant was, it was a common carrier. Seemingly rates had been fixed by the proper authorities. And it is provided by section 72-507, R. S. 1931, that it shall be unlawful for a common carrier to charge a greater or less rate for any service specified in the schedule of rates. If, then, a rate was charged in this case as such carrier

which was less than that which was lawfully fixed, the defendant violated the statute. It had no permit to operate as a contract carrier, and it would seem to be axiomatic that it could not change its character as a common carrier by violating the statute or by merely calling itself a contract carrier. In fact, the statute last mentioned, without passing upon it definitely, seems to forbid that a person or company may act in a dual capacity. Whether or not the defendant could, as a common carrier, lawfully make a contract for reduced liability, need not be determined. The mere reduction in the price for transportation could not have that effect, notwithstanding the astounding statement of counsel that it does have that effect, 'under all the authorities,' without citing us to a single one. It is almost unanimously held that such reduction cannot be effected without the assent of the shipper, and no such assent was shown herein. 10 C. J. 138; 4 R. C. L. 774." 45 P2d at 647.

In the instant case defendant argues that the agreement to handle the transaction on the same basis as the transaction in the previous year established the manner of fixing the rate and that the rate used in the previous year was under a leasing arrangement. The weakness in this position is that the character of the previous transaction was never clearly established as a lease arrangement rather than as a regular agreement for transportation by a common carrier.

■ It is our opinion that the jury could not justifiably conclude that the defendant relieved himself of his liability as a common carrier by charging the intracity rate for the cartage in this case. We can find no basis for the defendant's conclusion that the truck was leased to plaintiff. Here was a valuable piece of equipment, the use of which could create myriad legal problems. Normally, the parties to a lease of such equipment

would agree upon their respective rights and liabilities; ordinarily their agreement would be reduced to writing. The parties in the instant case made no effort to resolve these problems, but instead dealt upon the basis of a conversation which amounted to nothing more than the ordinary request by a shipper for trucking service and the acceptance of the business by the carrier. We are of the opinion that the defendant did not present sufficient evidence from which the jury could properly find the relation of lessor and lessee between the defendant and plaintiff.

 We have assumed arguendo that the defendant could, by special agreement, assume the role of contract carrier in transporting plaintiff's goods and thereby obtain immunity from the strict liability of a common carrier. That assumption generously favored the defendant's case. If a common carrier enters into a special contract to carry the same type of goods as he is authorized to carry under his permit he does not thereby change his position as a common carrier. This is clearly stated in *New York Central Railroad Co. v. Lockwood,* 84 US 357, 21 L ed 627 (1873):

> "A common carrier may, undoubtedly, become a private carrier, or a bailee for hire, when, as a matter of accomodation or special engagement he undertakes to carry something which it is not his business to carry. For example, if a carrier of produce, running a truck boat between New York city and Norfolk, should be requested to carry a keg of specie, or a load of expensive furniture, which he could justly refuse to take, such agreement might be made in reference to his taking and carrying the same as the parties chose to make, not involving any stipulation contrary to law or public policy. But when a carrier has a regularly established business for carrying all or certain articles, and especially if that carrier be a corporation created for the

purpose of the carrying trade, and the carriage of the articles is embraced within the scope of its chartered powers, it is a common carrier, and a special contract about its responsibility does not devest it of the character." 84 US at 377.

■ It is true that a common carrier may, under certain circumstances, continue its position as a common carrier and by special agreement limit its liability. But the limitation on its liability will not be recognized unless it is clearly manifested. This principle is recognized in *Voyt v. Bekins Moving & Storage Co.,* 169 Or 30, 119 P2d 586, 127 P2d 360 (1942) which relies upon *The New Jersey Steam Navigation Co. v. Merchants' Bank,* supra. In the latter case the court said:

"But admitting the right thus to restrict his [the carrier's] obligation, it by no means follows that he can do so by any act of his own. He is in the exercise of a sort of public office, and has public duties to perform, from which he should not be permitted to exonerate himself without the assent of the parties concerned. And this is not to be implied or inferred from a general notice to the public, limiting his obligation, which may or may not be assented to. * * *

"The burden of proof lies on the carrier, and nothing short of an express stipulation by parol or in writing should be permitted to discharge him from his duties which the law has annexed to his employment. The exemption from these duties should not depend upon implication or inference, founded on doubtful and conflicting evidence; but should be specific and certain, leaving no room for controversy between the parties." 6 Howard at p. 382, 12 L ed at p. 482.

See also *Wells v. Great Northern Ry. Co.,* 59 Or 165, 114 P 92, 116 P 1070, 34 LRA NS 818 (1911); *Seller v. Steamship Pacific,* 1 Or 409 (1861).

■ Accepting defendant's argument that there was a special agreement between him and the plaintiff with respect to the carriage of plaintiff's goods there was no agreement exonerating defendant from his common carrier liability. There certainly was no express agreement, and even if it were permissible to excuse defendant from liability upon the basis of an implied agreement, there was nothing in the preliminary negotiations for the hauling and there were no circumstances attendant upon the actual loading and transportation of the goods from which such an agreement could be implied. There being no agreement relieving the defendant from liability the jury would not be entitled to find one by implication or conjecture.

■ It is our conclusion that the defendant was a common carrier in transporting the plaintiff's goods. As a common carrier he is absolutely liable for the loss of goods entrusted to his care unless he can establish that the case falls within one of the exceptions to the general rule of strict liability, i.e., that the loss resulted from an act of God, or an act of the state, the public enemy, or the shipper, or that the damages were due to the inherent nature of the goods themselves. Brown, Personal Property (2d ed), p 423, et seq.

Defendant has not shown that his case is within any of these exceptions. Applying the fourth exception above excusing the carrier from liability where the loss results from the shipper's own conduct, if defendant had established that the goods were destroyed as a result of plaintiff's negligence in loading the truck (and it was also established that defendant or his servants were not negligent) the plaintiff would be barred from recovery. But defendant did not prove that plaintiff or his servants were negligent.

 The trial judge should have directed a verdict for the plaintiff leaving to the jury only the question of the amount of damages. The question of the amount of damages was not entirely resolved in the trial of the cause. We must, therefore, remand the case for a new trial. However, the issue of liability and the issue of the amount of damages are separable and since we have decided that defendant is liable for the loss we remand the case for a new trial only on the issue of the amount of damages recoverable by plaintiff. Under appropriate circumstances this court may remand a case for a new trial on a part only of the issues raised in the original proceeding. *Dunn v. Henderson,* 122 Or 331, 258 P 183 (1927); cf., *Scott v. Brogan,* 157 Or 549, 73 P2d 688 (1937); *Hust v. Moore-McCormack Lines, Inc.,* 180 Or 409, 177 P2d 429 (1947); *Oliver v. Skinner and Lodge,* 190 Or 423, 226 P2d 507 (1951). This practice, is in accord with that recognized in most other states. See Annotations in 98 ALR 941, supplemented in 29 ALR2d 1199. The cases make it clear that the granting of a new trial on a part of the issues only is subject to certain limitations (e.g., see 29 ALR2d 1199 at 1209). None of these limitations is applicable to the present case.

The judgment is reversed and the cause is remanded for a new trial on the issue of the amount of damages only.